UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - -X
JACQUIONE JOHNSON,

        Plaintiff,

    - against -

BRYCO ARMS, et al.

       Defendants.
- - - - - - - - - - - - - - -X
JOAN TRUMAN SMITH,

        Plaintiff,

    - against -

BRYCO ARMS, et al.

       Defendants.
- - - - - - - - - - - - - -X
CITY OF NEW YORK,

        Plaintiff,

    -against-

BERETTA USA CORP., et al.

       Defendants.
- - - - - - - - - - - - - - -X

Civil Action
No. CV-03-2582

(Weinstein, J.)
(Pollak, M.J.)

Civil Action
No. CV-02-3029

(Weinstein, J.)
(Pollak, M.J.)

Civil Action
No. CV-00-3641
(Weinstein, J.)
(Pollak, M.J.)

**BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND
EXPLOSIVES' SUPPLEMENTAL MEMORANDUM OF LAW IN
OPPOSITION TO SUBPOENAS AND INFORMAL DISCOVERY REQUESTS**

ROSLYNN R. MAUSKOPF
United States Attorney
Eastern District of New York
One Pierrepont Plaza, 14th Floor
Brooklyn, New York 11201

ELLIOT M. SCHACHNER
VINCENT LIPARI
Assistant U.S. Attorneys

## PRELIMINARY STATEMENT

The Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") respectfully submits this supplemental memorandum of law in support of its motion to quash the subpoena dated April 15, 2003 of plaintiff Joan Truman Smith, the subpoena dated April 19, 2004 of plaintiff City of New York and in opposition to the other requests for discovery made without subpoena (the informal discovery request) by plaintiff Jacquione Johnson.

At oral argument on April 23, 2004, the Court considered whether the production by ATF of law enforcement tracing data and certain federal firearms licensing data pursuant to a protective order of the type entered on September 18, 2002 in NAACP v. Acusport Corp., CV-99-7037[1] would violate the 2004 Appropriations Act. The Court and the parties focused their attention on one issue, i.e., whether production of the data to attorneys and experts, who were barred from releasing the data pursuant to a protective order, would constitute a public disclosure within the meaning of the 2004 Appropriations Act. At oral argument, ATF took the position that such a disclosure would violate the 2004 Appropriations Act.

ATF submits this memorandum to address whether the disclosure of data admitted into evidence in open court during the course of a jury trial would constitute a public disclosure in

---

[1]   The Protective Order and the Supplemental Memorandum & Order which modified it are set forth in NAACP v. Acusport Corp., 210 F.R.D. 268, 429-445 (E.D.N.Y. 2002)).

violation of the 2004 Appropriations Act. As shown below, such disclosure would constitute a prohibited public disclosure, because it would become part of the public record and no protective order can prevent the jurors or spectators at a jury trial from disclosing the data. Thus, ATF would be prohibited from spending any funds to produce the data in accordance with such a protective order. In addition, as demonstrated below, much of the data that is the subject of the subpoenas and the informal discovery requests is subject to the law enforcement privilege.

## STATEMENT OF FACTS

The Statement of Facts contained in ATF's Memorandum of Law In Opposition to Subpoena and Informal Discovery Request ("ATF Mem.") is incorporated by reference herein.

## ARGUMENT

## POINT I

### NO PART OF THE FIREARMS TRACE, LICENSING OR MULTIPLE SALES INFORMATION CAN BE DISCLOSED IN COURT

On January 23, 2004, Congress enacted the Consolidated Appropriations Act of 2004, Pub. L. No. 108-199, 118 Stat. 3 (2004), codified as amended at 28 U.S.C. 530C ("the 2004 Appropriations Act"). It provides in relevant part that:

> no funds appropriated under this or any other Act may be used to disclose to the public the contents or any portion thereof of any information required to be kept by licensees pursuant to section 923(g) of title 18, United States Code, or required to be reported pursuant to paragraphs (3) and (7) of section 923(g) of title 18, United States Code, except that this provision shall apply to any

request for information made by any person or

entity after January 1, 1998.

(emphasis added).

There is no dispute that the material covered by the 2004 Appropriations Act includes the firearms trace data sought by the plaintiffs, _e.g._ the identities of the federal firearms licensees in the distribution chain of traced firearms, as well as the out of business information, as previously defined by ATF.[2]  At oral argument on April 23, 2004, the Court considered the issue of whether production of the trace data and out of business information to attorneys and experts pursuant to a protective order of the type used in NAACP would constitute a "disclos[ure] to the public" in violation of the 2004 Appropriations Act. ATF's position, as expressed at oral argument, is that such production would constitute a prohibited "disclos[ure] to the public." Since ATF is the agency which maintains the data in question, and is charged with administering the appropriations measure in question, the Court should defer to ATF's construction of the 2004 Appropriations Act. See Household Credit Services Inc. v. Pfennig, __ U.S. __, __ S.Ct. __, 2004 WL 840101 (April 21, 2004).

However, even if the Court does not defer to ATF's construction of the 2004 Appropriations Act on this issue,

---

[2] There is also no dispute that the 2004 Appropriations Act also covers multiple sales data, which no party has requested from ATF.

production of the trace data and out of business information by ATF in accordance with an NAACP-type protective order should not be ordered because it would violate the 2004 Appropriations Act. Under the protective order in NAACP, some of the trace data produced was "disclose[d] to the public" in a manner that would have violated the 2004 Appropriations Act, had the Act been in effect at the time of the disclosures in NAACP. For example, the protective order provided that the trace data would be disclosed to certain attorneys and experts who would use the information to "compile statistics, analyses, extrapolations and other studies – all regarding the distribution of firearms which were the subject of a trace request." NAACP v. Acusport Corp., 210 F.R.D. 268, 431 (E.D.N.Y. 2002). The protective order further provided that these "statistics, compilations, extrapolations and other studies" could include the trace data, as long as they did not "reveal the identity of any persons referenced in the" data "or the particulars of any information regarding a criminal investigation referenced in the" data. Id. The protective order further provided that the "statistics, compilations, extrapolations and other studies" could be used "for publication in this proceeding." Id.

In accordance with the protective order in NAACP, much trace data – other than data revealing identities of persons and information concerning criminal investigations – was disclosed to public at the trial at NAACP. The trace data was conveyed in

6

testimony by expert witnesses and incorporated into exhibits. Trace data was included, _inter alia_, in three exhibits prepared by expert witnesses: (a) a list that set forth the number of guns sold by certain dealers that were recovered by the law enforcement in New York State; (b) a chart listing the names of over 1500 gun dealers and the number of traces associated with each dealer; and (c) a list setting forth, for certain manufacturers, the average number of guns traced per year for each manufacturer and the percentage of all traces attributable to each manufacturer. The trace data introduced as evidence in NAACP was revealed both to the jury that heard the case and to all spectators who observed the trial.[3]

The 2004 Appropriations Act, _inter alia_, prohibits the use of federal funds to "disclose to the public" the trace data and out of business information  "_or any portion thereof_" (emphasis added). If ATF were to produce the trace data and out of business information pursuant to an NAACP-type protective order, then a "portion" of the data and information – _i.e.,_ the portion of the data and information that does not reveal individual identities or ongoing criminal investigations - would be disclosed on the public record to the jury and spectators at trial. The transcript of the

_____

[3] Due to the 2004 Appropriations Act, ATF cannot now disclose trace data and thus cannot be any more specific as to the nature of the trace data disclosed to the public at the trial in NAACP.

trial, which would contain testimony revealing, and exhibits containing, this data and information, would be maintained on public file with the Clerk of the Court and thus could be disclosed to any person who wishes to review the Clerk's file. These disclosures, resulting from ATF's expenditure of appropriated funds would constitute a "disclos[ure] to the public" prohibited by the 2004 Appropriations Act.

This conclusion is consistent with Second Circuit case law on the definition of the term "public disclosure" as it appears in the False Claims Act, 31 U.S.C. § 3729 et seq. (FCA). Title 31 U.S.C. § 3730(e)(4) generally deprives federal courts of subject matter jurisdiction over FCA qui tam actions based upon the "public disclosure" of the underlying allegations or transactions in trials and hearings, but does not define the term "public disclosure."  In United States ex rel. Kreindler & Kreindler, 985 F.2d 1148 (2d Cir. 1993), the plaintiff, an attorney, brought an FCA action based on transactions which had been revealed in documents produced during the course of discovery in a prior state court action, in which the plaintiff had represented one of the parties.  The documents were produced pursuant to a protective order, but were subsequently filed with the state court, without any sealing or protective order. The Second Circuit held that the information contained in the documents "was publicly disclosed because it was available to anyone who wished to consult the court file." Id. at 1158. Accord,

United States ex rel. Huangyan Import & Export Corp., 2004 WL 74310 (S.D.N.Y. 2004) (dismissing action based on information contained in a complaint filed in a prior action, as the underlying information had been publicly disclosed).

Production of the requested trace data and out of business information by ATF in this case pursuant to an NAACP-type protective order would likewise lead to a "disclos[ure] to the public" of the portion of the trace data and out of business information that does not involve identification of individuals and criminal investigations. As in Kreindler, the transcripts of the testimony containing this data and information would be on file with the Clerk of the Court, and thus would be disclosed to the public. Furthermore, the data and information would be disclosed to the public in open court. It is not possible for a court to craft a protective order preventing jurors and spectators from disclosing this data and information the way that a court could craft a protective order preventing an attorney or an expert witness from disclosing the data and information. Over the past decade, jurors have routinely, and without punishment, disclosed information about their deliberations to the media. Indeed, since the instant cases are likely to generate public attention, as NAACP did, it is likely that news reporters and other media representatives will be present among the spectators at trial. News reporters and media

representatives will also have unfettered access to, and may review, the court files in these actions.

The disclosure of the trace data and out of business information to jurors and spectators at trial and to any member of the public who reviews the Court's files thus constitutes a "disclos[ure] to the public" for purposes of the 2004 Appropriations Act. Kreindler, 985 F.2d at 1158. See also United States ex rel. John Doe v. John Doe Corp., 960 F.2d 318, 322 (2d Cir. 1992)(disclosure by FBI agents of investigation of fraud to individuals who were not involved with the fraud, and who had no obligation to keep the disclosed information secret, constituted a "public disclosure" for purposes of the FCA). Since the 2004 Appropriations Act prohibits ATF from spending any funds to disclose to the public even portions of trace data and out of business information, ATF cannot produce the data and information for the express purpose of having the data disclosed, even in part, at trial.

During the oral argument, the Court appeared to express the view that ATF's expenses in producing the data and information would be de minimis. Transcript of Oral Argument at 68. However, the 2004 Appropriations Act provides unequivocally that "no funds" may be used for this purpose. There is no de minimis exception to this blanket prohibition. In any event, the costs to ATF for producing these documents would be substantial, not de minimis.

ATF estimates that it would take a computer technician three working days to compile the material requested by the City of New York and an additional three working days to compile the material requested by plaintiff Johnson[4]. The computer technician would have to, <u>inter alia</u>, construct parameters to access from the trace data base the information to be produced and download that information into a computer disk. In addition, ATF's Disclosure Division and its attorneys would have to review the downloaded data to ensure that the data is that requested or subpoenaed by the parties and to ensure compliance with provisions of any protective order protecting law enforcement privileged material. Producing the material requested by plaintiff Smith would impose additional costs upon ATF.

In addition, based on ATF's experience in <u>NAACP</u>, ATF would expend substantial amounts of time communicating with the parties in these cases after the production of trace data and out of business information. The parties in <u>NAACP</u> required several hours of detailed explanation from ATF regarding the substance of the data produced on disk pursuant to the protective order as well as instructions on how to use the disk. ATF would almost certainly have to provide similar assistance in these cases, which include

---

[4] Contrary to plaintiffs' assertions, all ATF personnel who assisted in the production of trace data in <u>NAACP</u> were full-time ATF employees, not contractors. All ATF personnel who would assist in the production of material in this case will likewise be full-time employees, not contractors.

parties who were not parties in <u>NAACP</u>. Moreover, if trace data and out of business information were produced in these cases pursuant to a protective order, personnel from ATF and the United States Attorney's Office will have to spend many hours to review proposed trial exhibits, to insure that the exhibits do not include law enforcement sensitive material. Moreover, the burden to ATF would be even greater if the Court grants the requests of the defendants, who seek the production of even more trace data than the plaintiffs. Accordingly, if the Court is inclined to rule that the costs to ATF would be anything less than those set forth herein, ATF respectfully requests that the Court hold an evidentiary hearing on this matter.

## POINT II

### THE LAW ENFORCEMENT PRIVILEGE SHIELDS ATF'S DATABASES FROM DISCLOSURE

Even if the 2004 Appropriations Act did not bar ATF from releasing the trace data - and it does - much of the trace data requested is protected from disclosure under the law enforcement privilege. At oral argument, the Court and some parties expressed doubt as to the privileged nature of the trace data. This issue, however, was resolved by Judge Weinstein in <u>NAACP</u> and should not be

revisited here.   In his protective order in <u>NAACP</u>, Judge Weinstein expressly held that "information in the trace database is protected by the law enforcement and privacy privileges." <u>NAACP</u>, 210 F.R.D. at 430. Judge Weinstein further held that release of the trace data, other than certain historical trace data that ATF had released pursuant to FOIA requests, "would reasonably be expected to seriously jeopardize criminal investigations and place at risk the physical safety of investigating law enforcement officers, informants, cooperating witnesses, suspects and others." <u>Id</u>.

Indeed, the chief law enforcement officer of the City of New York -- one of the plaintiffs that is requesting production of trace data in this case - has recognized the need to protect the confidentiality of trace data. Raymond W. Kelly, the Police Commissioner of the City of New York, in a letter to Attorney General Ashcroft dated August 19, 2002 stated:

> Law enforcement agencies at every level rely on the ATF's tracing system and resources to advance critically important investigations. The use of these traces has resulted in the successful closure of many criminal investigations, the conviction of numerous dangerous firearms offenders, the recovery of thousands of illegal firearms from unlicensed possessors, and the dismantling of many insidious and violent criminal organizations.

Kelly Letter, Appendix A hereto at 1.

Commissioner Kelly also forcefully described the harm that would result from the release of trace data:

> The release of trace information ... seriously
> jeopardizes not only the investigations, but
> also the lives of law enforcement officers,
> informants, witnesses and others. Even when this
> information does not identify specific individuals
> who may be endangered, merely disclosing that
> a trace was conducted may be enough to create
> a grave threat to life, to result in the flight
> of the suspects or the destruction of evidence,
> or to otherwise compromise investigations in
> which law enforcement agencies have invested
> so much.

Kelly Letter at 2. Commissioner Kelly also warned that the mere possibility that trace data would be released could cause some agencies to discontinue or curtail their use of the trace data, thereby seriously undermining "the effectiveness of the overall trace system." Id. Commissioner Kelly thus fully endorsed the position of ATF that the trace data, including the identities of the federal firearms licensees in distribution chain of traced firearms, is law enforcement sensitive information.

ATF submitted strong evidence to the Court in NAACP to support the applicability of the law enforcement privilege to the trace data. ATF demonstrated in its extensive declarations that the premature public release of the requested data, including the identity of potential suspects, witnesses, and interstate trafficking patterns, could "reasonably be expected to interfere with enforcement proceedings." In fact, ATF demonstrated the precise harm that the law enforcement privilege is designed to prevent is present in this case. See Solar Sources, Inc. v. United States, 142 F.3d 1033, 1039 (7th Cir. 1998) ("[p]ublic disclosure

14

of information could result in destruction of evidence, chilling and intimidation of witnesses, and revelation of the scope and nature of the Government's investigation"). The declarations that ATF submitted in NAACP are replete with examples of how public release of the withheld data, in conjunction with other released data, could lead to just such adverse effects and, thereby, interfere with ongoing or prospective enforcement proceedings. For example, David L. Benton, who at the time was Deputy Director of ATF, stated:

> a law enforcement investigation could be compromised if the news media or anyone other than the investigating law enforcement agency prematurely obtained trace data. They could then attempt to trace the firearm(s) themselves and contact potential defendants and witnesses to the crime, thus compromising the investigation by getting to the suspect or witnesses before the law enforcement agents do. A situation similar to this happened after the Columbine High School tragedy when the news media interviewed persons involved in selling the firearms used in the crime before law enforcement had a chance to interview them. Although in this example, the information was disclosed by local law enforcement, it illustrates how premature disclosure of trace information can interfere with law enforcement investigations.

Declaration of David L. Benton (Benton Decl.), Appendix B hereto, ¶ 36. [5]

_____

[5] This declaration was originally submitted to the court in City of Chicago v. United States Department of the Treasury, Bureau of Alcohol, Tobacco and Firearms, Case No. 00C3417 (N.D. Ill.). A copy of the declaration was submitted to this Court in NAACP.

ATF also showed in <u>NAACP</u> that premature public release of requester information data, along with weapons data, could not only jeopardize a potential investigation but put law enforcement officers at risk. As Mr. Benton explained:

> assume a local police officer is working undercover purchasing firearms from an associate of an FFL in Ohio. He is purchasing these legal firearms from the FFL with the understanding that he will be selling the firearms illegally on the streets of Detroit. If the FFL knows that his local police department is tracing the firearms, the investigation could be compromised and the police officer's safety could be in jeopardy because the criminals would make every effort to identify the law enforcement agency and the officers involved in the investigation.

Benton Decl. ¶ 39.

Similarly with regard to recovery location data (Street Direction, Street Name, Street Number, Apartment Number), "[p]ublic disclosure of this information could lead to members of the public visiting the premises, thus potentially altering or tampering with physical evidence, or contacting individuals who work or live at the recovery location, which could result in * * * notice to the suspect of an investigation, the intimidation of witnesses, disclosure by those individuals of information that could assist the perpetrator's flight, or the lack of cooperation with the investigating authorities." Benton Decl. ¶ 45. Mr. Benton gave the following example:

> in a case where someone kills four people at a local fast food restaurant and dumps the gun

> down the sewer on the next block, disclosure
> of the recovery location could tip the suspect
> that the police have found the weapon, and
> thus could be closing in on him prior to the
> time that the police are ready to arrest him.
> The place where a criminal attempts to hide
> the gun is often known only to the potential
> defendant.  Disclosure of law enforcement's
> recovery of the firearm with the exact serial
> number from the very location where the
> perpetrator left it would clearly tip off the
> criminal that law enforcement is on his trail.

Id.  See Solar Sources, 142 F.3d at 1039 (disclosure "could result

in destruction of evidence"); Alyeska Pipeline Serv. Co. v EPA, 856

F.2d 309, 312 (D.C. Cir.  1988) (disclosure could allow for

destruction or alteration of evidence, fabrication of alibis, and

identification of witnesses).[6]

In NAACP, ATF also submitted sworn declarations from

officials of the New York State Police and the City of Buffalo

Police Department to demonstrate the law enforcement sensitivity of

the trace data at issue in the instant case, to include the

identities of federal firearms licensees in the distribution chain

of traced firearms. Declaration of Pedro J. Perez, Appendix C

hereto at ¶¶ 2-9; Declaration of Harold Litwin, Appendix D hereto,

¶¶ 4-9.

---

[6] It should be noted that, while disclosure of an individual
data field by itself might appear to be innocuous, this
information cannot be viewed in isolation.  It is the public
disclosure of the various data fields plaintiff seeks, when
combined with other information publically available, that would
enable parties other than the jurisdiction that submitted the
trace request to "connect the dots" and interfere with ongoing or
prospective investigations.  See Benton Decl. ¶ 22.

The law enforcement privilege issues in this case are identical to those that were at issue in <u>NAACP</u>. Should the Court decide to revisit Judge Weinstein's holdings in <u>NAACP</u>, or to engage in any balancing of the law enforcement privilege with the needs of any of the litigants in these actions, then ATF respectfully requests that the Court hold an evidentiary hearing.

## CONCLUSION

The subpoenas served by plaintiff Smith and the City of New York should be quashed and the informal discovery request propounded by plaintiff Johnson should be denied to the extent that they seek to have ATF produce trace data, multiple sales data or out of business information, because ATF is barred from providing such data or information. In the alternative, the subpoenas and discovery requests should be denied to the extent that they seek public disclosure of information that Judge Weinstein held is subject to the law enforcement privilege.

Dated:  Brooklyn, New York
        April 30, 2004

                            Respectfully Submitted

                            ROSLYNN R. MAUSKOPF
                            United States Attorney
                            Eastern District of New York
                            One Pierrepont Plaza, 14th Floor
                            Brooklyn, New York 11201

ELLIOT M. SCHACHNER
VINCENT LIPARI
Assistant U.S. Attorneys
    (Of counsel)

APPENDIX   A



**THE POLICE COMMISSIONER**
CITY OF NEW YORK

August 19, 2002

Honorable John Ashcroft
United States Attorney General
United States Department of Justice
950 Pennsylvania Avenue, NW
Washington, D.C. 20530-0001

Dear Mr. Ashcroft:

I am writing to express my concern about the possibility that firearms trace information compiled by the Bureau of Alcohol, Tobacco, and Firearms (ATF) tracing system might be released in ways that will compromise critical law enforcement investigations and endanger the lives of Police Officers and members of the public.

It is my understanding that the recent decision by the Seventh Circuit Court of Appeals (in the case of *City of Chicago v. United States Department of Treasury, Bureau of Alcohol, Tobacco and Firearms*) and the court's denial of a request for *en banc* rehearing, if allowed to stand, will permit contemporaneous, unredacted disclosure of firearms trace information to anyone who asks for it, including the very criminals who are under investigation. Such a result clearly would be catastrophic for law enforcement, would compromise national security, and would signal the end of the trace program, as law enforcement agencies would no longer be able to rely on the current ability to share critical information confidentially.

Law enforcement agencies at every level rely on the ATF's tracing system and resources to advance critically important investigations. The use of these traces has resulted in the successful closure of many criminal investigations, the conviction of numerous dangerous firearms offenders, the recovery of thousands of illegal firearms from unlicensed possessors, and the dismantling of many insidious and violent criminal organizations. The ability to trace firearms, therefore, has become an essential tool in conducting a wide array of critical and sensitive law enforcement investigations. The use of this resource by local and state agencies also is a dramatic illustration of the need for and benefits of a continuing, close, and confidential cooperative relationship with federal agencies to prevent and solve crimes.

The prospect that information obtained through these traces may be available for release by request to ATF under the Freedom of Information Act (FOIA) is therefore quite disturbing. Even more alarming is the possibility that this information might be released while the investigation remains open. The release of trace information under FOIA seriously jeopardizes not only the investigations, but also the lives of law enforcement officers, informants, witnesses, and others. Even when the information does not identify specific individuals who may be endangered, merely disclosing that a trace was conducted may be enough to create a grave threat to life, to result in the flight of the suspects or the destruction of evidence, or to otherwise compromise investigations in which law enforcement agencies have invested so much. The possibility that information concerning investigations may be released and used in these ways may, in fact, result in some agencies discontinuing - or at least curtailing - their use of the trace system. Thus, the effectiveness of the overall trace system, as well as the essential relationship of cooperation that has been cultivated between federal and local law enforcement, also would be seriously undermined.

Accordingly, in order to ensure that this information is not released inappropriately, and that the ability to conduct such traces remains a useful tool for all law enforcement agencies, I wholeheartedly support ATF's efforts to protect and preserve the confidentiality of firearms trace records and information, and I encourage you to pursue an appeal of this case by seeking a writ of certiorari from the United States Supreme Court. Please do not hesitate to contact me if I may be of further assistance in this effort.

Sincerely,

Raymond W. Kelly
Police Commissioner

APPENDIX    B

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| CITY OF CHICAGO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CASE NO. 00C3417 |
| v. | ) | JUDGE LINDBERG |
| | ) | MAGISTRATE JUDGE DENLOW |
| | ) | |
| UNITED STATES DEPARTMENT OF | ) | |
| THE TREASURY, BUREAU OF | ) | |
| ALCOHOL, TOBACCO AND FIREARMS | ) | |
| | ) | |
| Defendant. | ) | |

DECLARATION OF DAVID L. BENTON,
ASSISTANT DIRECTOR, FIELD OPERATIONS
BUREAU OF ALCOHOL, TOBACCO AND FIREARMS

1.     I, David L. Benton, am the Assistant Director for Field Operations in the Bureau of

Alcohol, Tobacco and Firearms ("ATF"), U.S. Department of the Treasury. I have

served in this position since August 2000. As Assistant Director for Field Operations, I

am the principal assistant to the Director in policy formulation and implementation of

ATF's law enforcement efforts involving ATF special agents and inspectors assigned to

ATF's twenty-three field divisions nationwide. I either personally review or get briefed

daily on the criminal investigations and high-level industry-related issues pertaining to,

among other things, criminal firearms enforcement issues.

2.     The statements made in this declaration are based on knowledge that I have acquired in

the performance of my official duties. I have read and am familiar with the Complaint

and other papers filed in this case.

3.     The purpose of this declaration is to provide information about the Firearms Tracing

System ("FTS") and to explain the bases for ATF's decision to provide Plaintiff most,

1

but not all, of the data requested from the FTS under the Freedom of Information Act ("FOIA"). As explained herein, disclosure of the entire FTS could reasonably be expected to interfere with law enforcement proceedings and privacy interests.

4.    I have been a Special Agent with ATF since 1975. During my ATF career, I have served in various managerial and supervisory positions including Resident Agent in Charge in Wichita, Kansas, Assistant Special Agent in Charge in Kansas City, Missouri, and Special Agent in Charge in Chicago, Illinois. I have also held several positions in ATF headquarters, most recently serving two years as Assistant Director for Liaison and Public Information.

5.    As Assistant Director for Liaison and Public Information, I was responsible for all disclosures made by ATF under the FOIA and served as the deciding official on numerous FOIA requests for data from the FTS database.

6.    As a Special Agent and supervisor, I have had extensive experience in the area of firearms tracing throughout my career. I initiated numerous firearms traces as a criminal investigator. This process involved examining voluminous firearms records of Federal Firearms Licensees ("FFLs").

7.    I have also supervised a wide range of firearms enforcement activities including investigations of firearms traffickers and violent criminal organizations. A significant investigative tool in these investigations has been the tracing of firearms, which assists the investigators in locating the "sources" of firearms. Firearms tracing is a critical element of ATF's law enforcement mission, as it provides valuable investigative and strategic information about illegal sources of firearms. For example, trace information

can reveal that a purchaser is repeatedly buying firearms from an FFL or that guns recovered in crimes originate frequently from a particular FFL.

8.    I served as Deputy Associate Director for Law Enforcement from October 1993 to November 1995. In this position, I supervised major firearms tracing/trafficking projects in Detroit, Los Angeles, Baltimore, and Chicago. These projects served as the impetus for the formulation of ATF's National Tracing Center's ("NTC") Crime Gun Analysis Branch in West Virginia.

## ATF's Law Enforcement Mission

9.    The Secretary of the Treasury has statutory responsibility to enforce Federal firearms laws. The Secretary delegated these responsibilities to ATF by Treasury Order No. 120-01 (June 1972) (formerly T.D. Order No. 221, 37 Fed. Reg. 11,696).

10.   ATF is a criminal and regulatory enforcement agency within the Department of the Treasury and is responsible for, among other things, enforcing Federal firearms laws including the Gun Control Act of 1968 ("GCA"), 18 U.S.C. §§ 921-930 (2000) (originally enacted as Act of Oct. 22, 1968, Pub. L. No. 90-618, § 1, 82 Stat. 1213). The GCA established a licensing system for persons engaged in manufacturing, importing, dealing, and collecting firearms (i.e., FFLs). ATF enforces the licensing provisions of the GCA, which, among other things, regulates the interstate movement of firearms.

11.   The GCA requires FFLs to keep records of firearms acquisition and disposition, maintain that information at their business premises, and make these records available to ATF for search and inspection under certain specified circumstances. The GCA requires FFLs to respond within 24 hours after receiving a request for records as may be required to determine the disposition of one or more firearms "in the course of a bona fide criminal

3

investigation." 18 U.S.C. § 923(g)(7) (emphasis added).  NTC personnel enter the

information provided pursuant to a trace request in the Trace Database Sub-Module of

the FTS, which collects and tracks data on traces of firearms suspected of being involved

in a crime.  Utilizing these GCA records, ATF provides firearms tracing services in

support of criminal investigations to Federal, State, local, and international law

enforcement agencies.

12.     The GCA also requires FFLs to prepare a report of a multiple sale whenever they sell or

otherwise dispose of two or more pistols or revolvers (handguns) to an unlicensed person

within any five consecutive business days.  See 18 U.S.C. § 923(g)(3)(A).  These

multiple sales reports must be forwarded to the NTC, where they are entered into the

Multiple Sales Database Sub-Module, as well as to the law enforcement agency for the

jurisdiction in which the sale or disposition took place not later than the close of business

on the day that the transaction occurs.  Multiple sales may indicate illegal trafficking in

firearms, and the multiple sales reports are often the starting points for investigations of

illegal gun trafficking.

### Firearms Tracing

13.     To carry out its firearms tracing functions, ATF maintains the FTS, which is a law

enforcement information database, at the NTC.  The NTC provides ATF field agents and

other law enforcement agencies with "trace data" as quickly as possible as well as

investigative leads obtained from the traced firearm.

14.     "Tracing" a firearm is the systematic tracking of the history of a firearm from the

manufacturer or importer through wholesalers to the retail FFL(s) and ultimately to the

first retail purchaser.  A firearm trace begins when the NTC receives a request from the

4

Federal, State, local, or international law enforcement agency that recovers a firearm. The firearm typically is recovered at the scene of the crime or from the possession of a suspect, felon, or other prohibited person.

15. To conduct a trace, the requesting agency must provide the NTC with the manufacturer, weapon type, caliber, and the serial number of the firearm recovered in connection with a crime. In a typical case, after receiving a trace request, NTC personnel contact the manufacturer or importer to determine when and to whom the firearm in question was sold. When the NTC contacts an FFL requesting information, ATF informs the FFL only about the firearm involved in the trace; the FFL is not informed of any circumstances relating to the crime or which law enforcement agency recovered the firearm.

16. In most instances, the manufacturer or importer has sold the firearm to an FFL wholesaler. NTC personnel then contact the wholesaler to determine when and to whom the firearm in question was sold, usually to an FFL retailer. The tracing process continues as long as records allow and is considered successful when ATF can identify the first retail purchaser (a non-FFL) from an FFL. ATF's tracing process generally stops at the first retail purchase because any subsequent disposition of the firearm by a non-FFL is not subject to GCA record-keeping or reporting requirements.

17. The "trace data" are maintained in the Trace Database Sub-Module of the FTS and include the 8-digit identification number of the FFLs involved in the sale or transfer of the firearm along with any information regarding the retail purchaser of the firearm. Law enforcement agencies, including ATF, may use the "trace data" to link a suspect to a firearm-related criminal investigation, to identify any potential firearms traffickers, and to detect patterns in the sources and kinds of firearms that are used in a crime.

18. The NTC forwards the firearms tracing results directly to the requesting law enforcement agency. Approximately one-half of the requests in any given year are successfully traced to the retail purchaser of the firearm.

### Disclosure Concerns Under the FOIA

19. Requests from over 17,000 law enforcement agencies other than ATF in the United States and abroad comprise the bulk of firearms traces conducted by ATF. The remainder of the traces are conducted pursuant to ATF investigations. As of November 9, 2000, the FTS contains the results of 1,261,593 traces of which 920,655 originated from state and local law enforcement. In fiscal year 1999, ATF processed approximately 209,000 requests for firearm traces, the vast majority of which came from other law enforcement agencies.

20. Federal, State, local, and international law enforcement agencies are not required to advise ATF of the status of their investigations. The NTC provides the service of tracing firearms but does not track the status of these investigations. Thus, unless ATF's agents are involved directly in a case, ATF is not informed as to whether the requesting agency has an open criminal case that could be jeopardized by disclosing information pertaining to the firearm trace conducted by ATF. Nor is ATF informed when the requesting agency's criminal investigation has been concluded. However, there is no doubt that many of the over 1.2 million trace results in the FTS relate to open investigations. For this reason, ATF must be extremely cautious in disclosing law enforcement data from the FTS to members of the public under the FOIA.

21. Included among the Federal agencies that submit trace requests are United States government intelligence agencies that submit requests regarding the movement of arms

abroad. These requests are very sensitive and are handled in strictest confidence. Because firearms tracing is voluntary and depends in significant part on the requesting agency's expectation of ATF non-disclosure policy to maintain confidentiality, it is quite apparent that the release of "trace data" could be expected not only to compromise investigative and intelligence operations, but also to undermine the confidence in the NTC and the entire tracing process.

22. Because the data are not "reasonably segregable" in an open investigation-specific manner, ATF FOIA policy with respect to the FTS data at issue is to provide as much data as possible under the FOIA, but to withhold those data that would, when combined with information that ATF makes available to the public under the FOIA, reveal the results of ATF's trace before the law enforcement agency has had a reasonable opportunity to solve the crime that may be related to the traced firearm. Thus, through its balanced disclosure policy, ATF aims to prevent parties other than the jurisdiction that submitted the trace request to "connect the dots" or have all of the information necessary to attempt to trace firearms recovered in a crime while the investigation may be open.

23. The following example illustrates the importance of ATF's policy. ATF successfully interdicted an international firearms trafficking conspiracy in which several individuals were utilizing several different FFLs in South Florida to smuggle firearms into a Middle Eastern country. After obtaining the cooperation of two defendants, ATF discovered that this smuggling ring was also part of a much larger firearms trafficking conspiracy being investigated in Ohio. If parties other than the jurisdiction that submitted the trace requests to ATF had unredacted trace information, as sought by Plaintiff in this case, then they could have contacted the FFLs or purchasers in question in an effort to obtain

information about the purchaser(s) of the traced firearms, who were being investigated. Either of these results could have compromised a very sensitive international investigation that was later joined by Interpol.

24. Two recent ATF initiatives further demonstrate the importance of crime gun tracing with respect to illegal trafficking. Online LEAD is a computer-based software program that performs automated analysis by linking the identical information or data from numerous records such as a firearm trace and a multiple sale of firearms. For example, when the name of the purchaser is linked to multiple purchases of firearms recorded in multiple sales records, this could indicate that firearms being purchased in multiple sales are being subsequently diverted for illegal use. The linking of the same purchaser to several firearm traces would also be an indicator of illegal conduct, as would multiple sales of non-collectable firearms or firearms with a high incidence of use in crime.

25. Online LEAD provides investigative leads to ATF Special Agents and police officers working with ATF regarding illegal firearm traffickers by analysis of FTS data. Online LEAD provides ATF agents on ATF computers with a daily extract from the FTS that can be used to find repeat sellers and buyers of crime guns based on some of the data withheld under the FOIA such as the identity of the firearm's possessor and his associates. Armed with this information from the FTS, ATF agents at field offices throughout the country can work to identify possible illegal firearms trafficking, independent of any particular trace request.

26. Similarly, the Youth Crime Gun Interdiction Initiative ("YCGII"), which was developed in response to increased firearms crime involving America's youth, seeks to determine the illegal sources of guns for youths by analyzing trace data to detect patterns in the

local supply of crime guns. Participating law enforcement agencies in the initiative committed to having all crime guns recovered in their jurisdictions traced through the NTC. YCGII is ATF's primary investigative technique to identify the sources of illegal firearms trafficking to juveniles.

27. Assume, for example, that the Baltimore Board of Education finds a significant number of firearms on school property and requests that they be traced. ATF agents in pursuit of a YGCII investigation develop a confidential informant who identifies the source of the firearms as a particular FFL. As a result, ATF requests that the FFL not be contacted by the NTC as part of a firearm trace. Investigation reveals that the FFL is paying people off the street to fill out the GCA-required firearms acquisition and disposition records. The FFL then delivers the guns to Baltimore for sale. If the FFL were able to determine from publicly available ATF data that his weapons are being traced prior to the disclosure of such information per ATF policy, then he could avoid detection by altering or moving illegal operations prior to completion of the investigation and, thus, contravene ATF's goal of protecting the integrity of law enforcement investigations. ATF can identify an FFL involved in criminal activity through the use of multiple sales records without the need to alert the FFL as part of a firearm trace.

28. Because of these concerns, it is a standard operational security practice in the law enforcement community that shared investigative information concerning a recent crime should not be disclosed without the specific authorization of the original investigating agency where disclosure could compromise an investigation or reveal the identities of law enforcement personnel or third parties. The premature release of all of the information sufficient to trace firearms relating to an open investigation may well

9

compromise a criminal case in that evidence may be tampered with or the safety of investigators, informants and witnesses may be jeopardized if a potential defendant discovers their involvement in an investigation.  With over 200,000 traces per year for approximately 17,000 law enforcement agencies in the United States and abroad, it would be impossible for ATF to identify the open cases and the information whose disclosure would compromise a criminal investigation and to segregate the open investigations from the closed investigations.  This task would involve maintaining regular contact with each requesting agency to determine this information, which ATF does not need for enforcement purposes.

29.   ATF's concerns regarding the release of the information sought by Plaintiff are shared by the Fraternal Order of Police ("FOP"), which has more than 290,000 members and the Law Enforcement Steering Committee ("LESC"), an entity representing over 500,000 law enforcement officers and police practitioners in such organizations as the National Association of Police Organizations and the Major Cities Chiefs.  The FOP's and LESC's member agencies have long utilized ATF's firearms tracing, and their participation in ATF's firearms tracing efforts is based on the trust and understanding that ATF will not disclose the information in question to anyone other than the requesting agency if there is any chance of compromising an investigation or disclosing the names of enforcement personnel or third parties.  The FOP and LESC have expressed particular concern to ATF about the premature disclosure of data that would link a specific firearm being traced to the particular FFLs, the individual purchaser, the possessor and any associates, and the location where the crime occurred because it could jeopardize their members' cases and

the continued value of the NTC to them.  Recent letters from the FOP and LESC to ATF

are attached hereto as Attachment 1.

<u>Data Withheld In Response to Plaintiff's FOIA Requests</u>

30.   As described in paragraph 11 of the Declaration of ATF Disclosure Division Chief

Dorothy A. Chambers, the complaint that is the subject of this litigation concerns law

enforcement data from two sub-modules – the Trace Database Sub-Module and the

Multiple Sales Database Sub-Module -- of the FTS.  Pursuant to the FOIA, ATF discloses

all but a small portion of the data contained in these two sub-modules.  The small amount

of withheld data is justified pursuant to FOIA Exemptions 6, 7(A), and 7(C), and is

reflected in the chart concerning the data at issue in Attachment 2 to Ms. Chambers's

Declaration.

31.   Exemption 7(A) entitles ATF to withhold as exempt from public disclosure information

that is "compiled for law enforcement purposes" to the extent that "the production of

such law enforcement records or information . . . could reasonably be expected to

interfere with enforcement proceedings. . . ." 5 U.S.C. § 522(b)(7)(A).  Exemption 7(C)

authorizes the withholding of law enforcement records that "could reasonably be

expected to constitute an unwarranted invasion of personal privacy. . . ." <u>Id</u>.

§ 552(b)(7)(C).  Under Exemption 6, ATF may also withhold information about

individuals in "personnel and medical and similar files" when the disclosure of such

information "would constitute a clearly unwarranted invasion of personal privacy." <u>Id</u>.

§ 552(b)(6).  ATF must strike a reasonable balance between open disclosure and the

protection of legitimate law enforcement and privacy interests.

11

32.    The Trace Database Sub-Module contains approximately 300 data elements.  The data elements in the Trace Database Sub-Module can be grouped into the following six general categories:  (i) information about the law enforcement agency requesting the trace, such as the agency's name, address, case number, and investigative notes provided by the agency; (ii) information provided by the requesting agency regarding its recovery of the firearm, such as the date and location where the traced firearm was taken into custody by the requesting agency; (iii) information about purchasers of the traced firearm; (iv) information about possessors of the traced firearm and any associates (i.e., persons with the possessor of the firearm when the firearm comes into police custody), such as their names and addresses, driver's license information and social security numbers, and any related vehicle information; (v) information identifying each FFL that has sold the traced firearm; and (vi) information about the traced firearm such as the manufacturer, importer, model, weapon type, caliber and serial number.

33.    The Multiple Sales Database Sub-Module contains a subset of data elements that are also in the Trace Database Sub-Module.  The data elements include purchaser name and identifying information (e.g., address and date of birth), weapons information (e.g., manufacturer, weapon type, serial number, and caliber), and FFL identifying information, (e.g., name and address).  ATF uses the Multiple Sales Database Sub-Module to develop leads regarding illegal firearm trafficking.  That is, ATF analyzes multiple sales data to develop investigative leads for those persons who engage in business as unlicensed firearms dealers or who transport or sell firearms illegally in interstate commerce.

ATF's Withholdings Under FOIA Exemption 7(A)
For Data From the Trace Database Sub-Module

34.   The Trace Database Sub-Module data at issue in this case (i.e., the data identified in

Section III of Plaintiff's Bill of Particulars) can be organized into the following six

categories:  Requester Information Data, Weapon Data, Recovery Location Data,

Possessor and Associates Data, FFL Identification Data, and Purchaser Identification

Data.

35.   ATF withholds all data in the Trace Database Sub-Module for a period of one year under

Exemption 7(A) because firearms traces may take many weeks or months to complete,

and the delay allows law enforcement personnel sufficient time to complete the trace

process of identifying purchasers and possessors of the firearm after it leaves the FFL's

distribution chain.  The one-year withholding period for all trace data also protects

against the possibility of interference with a recently-opened investigation.  After one

year, ATF releases data that the agency determines is not likely to cause such

interference.

36.   For example, a law enforcement investigation could be compromised if the news media

or anyone other than the investigating law enforcement agency prematurely obtained the

trace data.  They could then attempt to trace the firearm(s) themselves and contact

potential defendants and witnesses to the crime, thus compromising the investigation by

getting to the suspect or witnesses before the law enforcement agents do.  A situation

similar to this happened after the Columbine High School tragedy when the news media

interviewed persons involved in selling the firearms used in the crime before law

enforcement had a chance to interview them.  Although in this example, the information

13

was disclosed by local law enforcement, it illustrates how premature disclosure of trace

information can interfere with law enforcement investigations.

37.   ATF has produced to Plaintiff all existing requested data from the Trace Database Sub-

Module through December 31, 1998,[1] with the exception of data from nine of the 300-

plus data elements in this Sub-Module, which are withheld for five years under

Exemption 7(A), and individuals' name and address data, which are withheld indefinitely

for privacy reasons under Exemptions 6 and 7(C).

38.   ATF withholds data from the nine data elements[2] for five years under Exemption 7(A)

because their release, combined with the other FTS data that ATF currently releases,

would enable members of the general public to trace firearms used in crimes and

interfere with law enforcement investigations.  ATF is willing to release this information

after five years because, in ATF's experience, trace information tends to become "stale"

and less important to law enforcement agencies after five years.  This five-year term is

also consistent with the statute of limitations for violations of the GCA, 18 U.S.C.

§ 3282, which sufficiently reduces the law enforcement interest in the data after that time

to tip the balance under the FOIA in favor of disclosure.  Thus, ATF has determined that

protection of the data for five years strikes the most appropriate balance between public

disclosure of as much information as possible and the protection of law enforcement

---

[1]Data through December 31, 1999 will be released to the public as of January 1, 2001.

[2]Requester Information Data (ORI Code, Agency Name, Agency City, and Agency Zip Code);
Weapon Data (Serial Number and Importer Name); the FFL Identification Data (FFL Number
and Invalid Dealer Number), and Purchaser Identification Data (Purchase Date only; the other
data elements in this category are withheld indefinitely under Exemptions 6 and 7(C), as
explained below).

efforts.  The application of Exemption 7(A) for each category of data withheld is explained below.

Requester Information Data

39.     ATF withholds the Requester Information Data[3] under Exemption 7(A) because premature disclosure of this information would reveal which law enforcement agency has requested a firearms trace.  The "requester" refers to the law enforcement agency that has requested tracing assistance from ATF pursuant to the GCA.  When combined with other data contained in the Trace Database Sub-Module, public disclosure of the Requester Information Data could reveal prematurely the existence of a law enforcement investigation by the investigating agency.  Premature public disclosure of the ORI Code, which, like the Agency Name, identifies a non-ATF law enforcement agency that requested the trace, would inform the public that such agency was conducting an investigation into a crime involving a firearm already publicly disclosed under the FOIA by make, model, and serial number.  For example, assume a local police officer is working undercover purchasing firearms from an associate of an FFL in Ohio.  He is purchasing these legal firearms from the FFL with the understanding that he will be selling the firearms illegally on the streets of Detroit.  If the FFL knows that his local police department is tracing the firearms, the investigation could be compromised and the police officer's safety could be in jeopardy because the criminals would make every effort to identify the law enforcement agency and officers involved in the investigation. Withholding the ORI Code (and the rest of the Requester Information Data) allows the investigating agency the time to utilize the information provided on the trace report (to

_____

[3]Requester Information Data at issue consists of four data elements:  ORI Code, Agency Name, Agency City, and Agency Zip Code.  See Pl.'s Bill Req. 1-3.

conduct interviews of the FFL, suspects, develop additional investigative leads, etc.)

without fear of having its law enforcement investigation jeopardized by an outside

source. Again, the jeopardy to law enforcement derives from the disclosure of the

investigating agency in the context of the information already made public under the

FOIA by ATF. For similar reasons, ATF withholds the Agency City and Zip Code for

five years, as it would be fairly easy for a member of the public to discern the requesting

agency given this level of specificity, especially in lightly populated jurisdictions.

Weapon Data

40.     ATF withholds the Weapon Data[4] under Exemption 7(A) because these data can tip off

non-law enforcement personnel as to important aspects of an active investigation

concerning a firearm used in a crime.

41.     The serial number of traced firearms is withheld for one year for the reasons described in

¶ 35. The only exception is that ATF withholds serial numbers of traced firearms for five

years if the firearm is involved in a multiple sale. Only 1.3% of the completed traces in

the Trace Database Sub-Module concern a firearm purchased as part of a multiple sale.

42.     The serial number of the firearm is one of the most critical pieces of information relative

to firearms traces. Greater protection is necessary in the context of multiple sales due to

ATF's disclosure of the retail FFL's identity as well as the serial numbers of handguns

involved in multiple sales in the Multiple Sales Database Sub-Module under the FOIA.

If the serial numbers of firearms included in both the Trace Database Sub-Module and

the Multiple Sales Database Sub-Module were released prior to five years after the date

of the trace, then non-law enforcement personnel would have enough information to

---

[4]Weapon Data at issue consists of two data elements: Serial Number and Importer Name. See
Pl.'s Bill Req. 9-10.

16

identify FFLs involved in a firearms trace before the expiration of the five-year period established by ATF. Prior to five years, ATF releases from the Trace Database Sub-Module only three digits of the eight-digit number that ATF uses to identify an FFL. See infra ¶ 49. However, all eight digits are released from the Multiple Sales Database Sub-Module, albeit without connection to any particular trace investigation. Thus, parties other than those directly involved in the investigation at issue could link the firearm from a trace to a multiple sale record and identify the FFL that made the final retail sale. Specifically, non-law enforcement personnel would have both the serial numbers of traced firearms and the FFL's eight-digit number from whom the traced firearms were purchased.

43.   In addition, premature disclosure of the serial numbers, in conjunction with other released data, would make it more difficult for law enforcement agents to discern firearms trafficking patterns because traffickers could ascertain whether their purchases are being examined by law enforcement personnel. That is, traffickers could shift their purchase patterns and firearms sources to avoid detection. For example, a multiple purchaser of firearms could cease making multiple purchases, thereby making it more difficult to identify the pattern of a firearms trafficker. This can be seen in States that have enacted laws allowing only one handgun purchase per month. Trends indicate that ten straw purchasers now purchase one firearm each whereas one straw purchaser used to purchase ten firearms in a single transaction.

44.   The Importer Name is released after five years based on the same rationale. If ATF were to disclose the importer name, members of the public would know which FFL imported the firearm used in a crime. Given that information, the importer could be approached by

private investigators, members of the media, possible suspects, witnesses, or others whose actions could interfere with an active law enforcement investigation. Again, the jeopardy to law enforcement investigations results not from release of this specific data, but rather the release of this data in conjunction with all of the other date released by ATF. Such interference could lead to alerting suspects prematurely or endangering witnesses and informants. Moreover, an importer can also make direct retail sales of firearms. As such, they can be the closest link to the first retail purchaser, thus raising the potential to compromise an investigation if they are prematurely contacted by the public.

Recovery Location Data

45.    The Recovery Location Data[5] are withheld under Exemption 7(A) because they reveal the physical location of a firearm involved in a crime. Recovery location is the street address or vehicle identity where the traced firearm was found by law enforcement or when there is no address (for example, where a criminal throws the firearm into a river), the recovery location is the nearest street address. As such, that location may be part of the crime scene or may concern the home or business address of the victim, suspect, witness, or an acquaintance thereof. Public disclosure of this information could lead to members of the public visiting the premises, thus potentially altering or tampering with physical evidence, or contacting individuals who work or live at the recovery location, which could result in, among other things, notice to the suspect of an investigation, the intimidation of witnesses, disclosure by those individuals of information that could assist

---

[5]Recovery Location Data at issue consists of seven data elements:  Route Number, Apartment Number, Street Number, Street Direction, Street Name, Street Suffix, and Zip Code. See Pl.'s Bill Req. 16-22.

18

the perpetrator's flight, or the lack of cooperation with the investigating authorities. For example, in a case where someone kills four people at a local fast food restaurant and dumps the gun down the sewer on the next block, disclosure of the recovery location could tip the suspect that the police have found the weapon, and thus could be closing in on him prior to the time that the police are ready to arrest him. The place where a criminal attempts to hide the crime gun is often known only to the potential defendant. Disclosure of law enforcement's recovery of the firearm with the exact serial number from the very location where the perpetrator left it would clearly tip off the criminal that law enforcement is on his trail.

46.     ATF does not claim Exemption 7(A) for the Recovery Location Data after five years. However, ATF continues to withhold all of these data to protect the privacy interests of the individuals who live or work on the premises, as discussed further below.

Possessor and Associates Data

47.     The Possessor and Associates Data[6] are withheld under Exemption 7(A) because they reveal the names and addresses of individuals who possessed a firearm or were directly associated with the possessor when the firearm involved in a crime was recovered. These people may be witnesses, suspects, or acquaintances of suspects, and thus, their public identification with a crime may cause them to flee the jurisdiction, inform the perpetrator of the investigation and the trace, or manufacture an alibi for any possible involvement with the crime. To the extent that an associate became a witness or informant, the

---

[6]Possessor and Associates Data at issue consists of 11 data elements: Last Name, Middle Name, First Name, Name Suffix, Route Number, Apartment Number, Street Number, Street Direction, Street Name, Street Suffix, and Zip Code. See Pl.'s Bill Req. 23-33.

routine public disclosure of his name and address could put him in physical danger or, at minimum, discourage witness or informant cooperation in future investigations.

48.    ATF does not claim Exemption 7(A) for the Possessor and Associates Data after five years but continues to withhold all of these data to protect the privacy interests of the individuals whose names and addresses are contained in these data elements, as discussed further below.

FFL Identification Data

49.    The FFL Identification Data[7] are withheld for five years under Exemption 7(A) because they reveal the FFL(s) who sold the firearm involved in a crime.  Within five years of a trace request, ATF releases the first three digits in the FFL number, which identify the State and region of the FFL(s) involved in a trace.  Disclosure of the entire FFL Numbers prior to that time would create a significant risk that the disclosure of this information could prematurely reveal the existence of an investigation, which could compromise that investigation.  As noted elsewhere herein, providing the specific identity of the FFL in conjunction with other data released by ATF, such as serial numbers of traced firearms, would allow third parties not involved in the specific law enforcement investigation in question to "connect the dots" and potentially compromise such an investigation, especially where the FFL is suspected of wrongdoing (e.g., illegal trafficking).

50.    For example, an FFL owner and FFL employees may be witnesses, suspects, or accomplices to the crime committed with that firearm.  If ATF were to disclose the entire eight-digit FFL number, members of the public would know which FFL sold the firearm in question, which is already identified to the public by the serial number.  Given that

_____

[7]FFL Identification Data at issue consists of three data elements:  FFL Number and Invalid Dealer Number.  See Pl.'s Bill Req. 34-35.

information, the FFL owner and employees could be approached by private investigators, members of the media, possible suspects, witnesses, or others whose actions could interfere intentionally or unintentionally with an active law enforcement investigation by, among other things, tampering with these individuals' potential testimony.

51.   Another example is an ATF case where firearms were being purchased in Georgia and transported to New York.  Through firearm tracing over a period of time, ATF agents in New York were able to identify an FFL who was selling guns in Georgia that were being recovered in New York.  ATF was able to enlist the assistance of the retail FFL in Georgia and set up surveillance from the time of sale through the trafficking of the firearms into New York.  If the identity of the FFL who was illegally selling the firearms had been released prematurely, that is, before ATF secured his cooperation, in connection with the disclosure of the serial numbers of the firearms in question and other released information, the investigation could have been compromised.  That is, the FFL would have been on notice that the specific firearms he knows were illegally diverted have been recovered by law enforcement in another State.  Obviously, the FFL would begin taking actions to thwart the ongoing investigation by refusing to sell to the violators and causing the traffickers to go elsewhere or warning the violators prior to contact by the ATF agents.[8]  Until the investigation was completed, GCA violations could not be established conclusively.  In this case, surveillance was critical to proving GCA violations.  Cases like this can take two years or longer to develop as firearms are recovered that indicate a pattern of possible violations.  The follow-up investigation can also take several years to complete.

---

[8] In such cases, ATF would not contact the target FFL as part of the trace.

52.   In another ATF case, a five-month undercover investigation of a corrupt FFL resulted in the execution of a Federal search warrant. After the execution of the search warrant, the FFL agreed to cooperate and functioned as a "storefront" operation for firearms traffickers for an additional nine months. Premature release of the FFL information and additional information already disclosed by ATF under the FOIA would be sufficient to link the traced firearms to the FFL. This knowledge could be used to compromise the investigation and potentially endanger a cooperating witness and law enforcement personnel. Violators could monitor the trace information to see if law enforcement is investigating any of the trafficked firearms. If the stolen firearms were sold to an FFL acting as a "fence" and the firearms were traced, then the violator could determine if the firearms had gained the attention of a law enforcement agency.

53.   The Invalid Dealer Number is a number assigned to Federal, State, local, military, and foreign governments who are not required under the GCA to obtain a Federal firearms license to sell firearms. When a gun that has been purchased by one of these agencies is subsequently recovered in a crime (whether the gun was stolen, lost, or legally traded-in to obtain revenue for newer weapons) the agency information is entered into the Trace Database Sub-Module under the heading "invalid FFL." These data are protected under Exemption 7(A) to allow the investigating agency to determine the value of the information without concern that their investigation would be jeopardized by an outside source. For example, potential suspects could be members of the "invalid FFL" who are illegally selling the firearms in question.

Purchaser Identification Data

54. The Purchaser Identification Data[9] are withheld under Exemption 7(A) because they reveal the names and addresses of individuals who purchased a firearm involved in a crime. Like a possessor or associate, a purchaser may be a suspect, accomplice, witness to the crime, or an acquaintance thereof; thus, the purchaser's public identification with a crime may cause him to flee the jurisdiction, inform the perpetrator of the investigation and the trace, or manufacture an alibi for any possible involvement with the crime. Any of these outcomes could frustrate the criminal investigation.[10]

55. The purchase date of the firearm is withheld because, in combination with the data released under the FOIA such as make, model, and serial number of the traced firearm(s), the date could easily identify the FFL who sold a firearm. The FFL may be a witness or a subject of an investigation on the sale, transfer, or use of the firearm in a crime. A corrupt FFL would have the ability to identify by serial number firearms he or she had diverted and therefore would know with certainty that the firearms had been recovered and that he or she is being investigated. Other interested parties could identify the FFL from the date and description of the firearm and possibly interfere in the investigative process.

56. For example, an FFL may be reporting firearms as stolen when, in reality, he is trafficking the firearms "off of the books." ATF could be investigating these thefts,

---

[9] Purchaser Identification Data at issue consists of 12 data elements: Purchase Date, Last Name, Middle Name, First Name, Name Suffix, Route Number, Apartment Number, Street Number, Street Direction, Street Name, Street Suffix, and Zip Code. See Pl.'s Bill Req. 39-50.

[10] As a matter of policy, ATF deletes the name data elements (i.e., Last Name, Middle Name, First Name, and Name Suffix) after eight years. Thus, the Trace Database Sub-Module contains no name data for purchasers of firearms involved in a trace before January 1, 1992. This policy is consistent with Congressional concerns about the privacy rights of law-abiding firearms owners, discussed further below.

without immediate suspicion of the FFL. The firearms would be traced to see if they were turning up in crimes. If the trace information and purchase dates were released, the FFL could become aware that the firearms are being traced and that he is being investigated and, therefore, take steps to avoid detection.

57.    ATF does not claim Exemption 7(A) for the Purchaser Identification Data after five years but continues to withhold all of these data (except for Purchase Date) to protect the privacy interests of the individuals whose names and addresses are contained in these data elements, as discussed further below

### ATF's Withholdings Under FOIA Exemption 7(A)
### For Data From the Multiple Sales Database Sub-Module

58.    ATF withholds all existing data requested by Plaintiffs from the Multiple Sales Database Sub-Module under Exemption 7(A) for a period of two years.[11] ATF has produced to Plaintiff all national data in the Multiple Sales Database Sub-Module through June 30, 1998, except for Purchaser Involved In Multiple Sales Data, which are withheld to protect the purchasers' privacy interests, as discussed further below.

59.    ATF withholds for two years all of the multiple sales data requested by Plaintiff because disclosure of the data of a reported multiple sale within that time would compromise ATF's ability to formulate strategies and to discern and act upon possible patterns and trends of firearms trafficking. In ATF's experience, a firearm recovered in connection with a crime within two years of its sale is a strong indicator that the firearm was illegally diverted (i.e., purchased with the intent to commit a crime). Where that sale is found to be part of a multiple sale, such evidence carries even greater weight and may suggest to

---

[11]As explained in ¶ 12, the Multiple Sales Database Sub-Module contains data derived from reports that FFLs must complete under the GCA whenever they sell or otherwise dispose of at least two handguns to any unlicensed person within any five consecutive business days. See 18 U.S.C. § 923(g)(3)(A).

ATF that the purchase was related to illegal firearms trafficking involving additional weapons and purchasers.

60. A two-year cushion for disclosure of all multiple sales information provides ATF with important protection against public contacts with FFLs or purchasers of multiple sales that could hinder any trafficking-related investigations. Two years also gives ATF an opportunity to study multiple sales patterns among FFLs and purchasers before the general public can, thus making it more difficult for traffickers to study and, therefore, change, their firearms transactions patterns. Thus, in balancing law enforcement concerns against disclosure interests, ATF has decided that, absent Exemption 7(C) privacy concerns, as expressed below, all multiple sales information would be released under FOIA after two years.[12]

61. An ATF case illustrates the necessity of the two-year policy on multiple sales data. ATF agents examining multiple sales reports became aware of a group that was trafficking drugs from New York to North Carolina and guns from North Carolina to New York. Perfecting this case required a great deal of surveillance and extensive investigation that might not have been possible if the multiple sale information were released prior to the expiration of the two-year cushion. That is, non-Federal prosecutors, who are aggressively investigating firearms violations without ATF involvement, could have intervened in and inadvertently compromised the investigation, or the violators could have learned that they were under investigation. Moreover, premature disclosure of the

---

[12]The Multiple Sales Database Sub-Module contains data used to develop leads to crimes and trends in trafficking, which require more time to develop than investigations concerning a trace. By contrast, data from the Trace Database Sub-Module concern firearms suspected of being used in a crime already committed. Therefore, with the exception of the nine data elements previously discussed, which are withheld for five years, the rest of the requested trace data can be released sooner than multiple sales data without compromising the intended purpose of collecting the data.

multiple sales records could have caused the violators to change their method of operation, such as making single purchases of firearms (e.g., having ten people purchase one firearm each instead of one person purchasing ten firearms), or moving to the secondary gun market such as flea markets and gun shows.

ATF's Withholdings Under FOIA Exemption 7(C)
For Data From the Trace Database and Multiple Sales Database Sub-Modules

62.     The information withheld under Exemption 7(C) from both the Trace Database Sub-Module and the Multiple Sales Database Sub-Module consists of the names and/or addresses of third parties in a law enforcement database.

63.     ATF's concern regarding the privacy interests at issue in this litigation is consistent with other Congressional limitations on the Government's maintenance and disclosure of personal information, such as names and addresses, namely, the Privacy Act of 1974, 5 U.S.C. § 552a (1994 & Supp. IV 1998), the Treasury Department Appropriations Act, Pub. L. No. 95-429, 92 Stat. 1002 (Oct. 10, 1978), and the Firearms Owners' Protection Act, Pub. L. No. 99-308, 100 Stat. 449 (May 19, 1986) ("FOPA," codified at 18 U.S.C. § 926(a)).

64.     The Privacy Act restricts the disclosure of personally identifiable records maintained by federal agencies. The Trace Database Sub-Module and the Multiple Sales Database Sub-Module each is a "system of records" – "a group of any records under the control of any agency from which information is retrieved by the name of the individual or by some identifying number, symbol, or other identifying particular assigned to the individual." 5 U.S.C. § 552a(a)(5). Because the data withheld under Exemptions 6 and 7(C) are identifiable by name and/or address and are not required to be disclosed under the FOIA, they are entitled to protection under the Privacy Act.

26

65.    In addition, Congress consistently has restricted ATF's use of firearms licensee records in order to protect the privacy interests of lawful gun owners. The Treasury Department's annual appropriations have been conditioned expressly on the prohibition against the use of appropriated funds to consolidate or centralize records concerning the acquisition and disposition of firearms maintained by FFLs. See, e.g., Pub. L. No. 95-429, 92 Stat. 1002 (Oct. 10, 1978); Pub. L. No. 106-58, 113 Stat. 430, 434 (Sept. 29, 1999). In fact, the privacy interests of firearms owners is of such Congressional importance that Congress ordered the U.S. General Accounting Office ("GAO") to conduct an investigation of ATF to ensure the agency's compliance with "legislative restrictions on centralizing and consolidating data from federal firearms licensee records." See U.S. Government Accounting Office, Report to the Chairman, Subcommittee on Treasury, Postal Service, and General Government, Committee on Appropriations, House of Representatives, Federal Firearms Licensee Data: ATF's Compliance with Statutory Restrictions 1 (Sept. 1996).

66.    Likewise, in passing the FOPA, Congress explicitly found that "additional legislation is required to reaffirm the intent of the Congress, as expressed in section 101 of the Gun Control Act of 1968, that 'it is not the purpose of this title to place any undue or unnecessary Federal restrictions or burdens on law-abiding citizens with respect to the acquisition, possession, or use of firearms appropriate to the purpose of hunting, trapshooting, target shooting, personal protection, or any other lawful activity, and that this title is not intended to discourage or eliminate the private ownership or use of firearms by law-abiding citizens for lawful purposes.'" Pub. L. No. 99-308, 100 Stat. 449.

27

67.   ATF invokes Exemption 7(C) with respect to Recovery Location Data, Possessor and

Associates Data, and Purchaser Identification Data (with the exception of the Purchase

Date, for which only Exemption 7(A) is claimed) from the Trace Database Sub-Module

and Purchaser Involved in Multiple Sales Data[13] from the Multiple Sales Database Sub-

Module. ATF does not release any of these data to the public under the FOIA because

the minimal public interest in the disclosure of the personal information of individuals

contained in these sub-modules does not outweigh the substantial privacy interests at

stake. As indicated previously, many of the persons whose names and/or addresses are in

the FTS are not suspects or defendants. They simply purchased or possessed firearms or

resided near the recovery location of firearms that were subsequently traced for reasons

unrelated to their activities. As a practical matter, ATF cannot distinguish the innocents

from the suspects because it lacks sufficient information from the requesting agencies.

Recovery Location Data

68.   With respect to the Recovery Location Data, ATF withholds the addresses where a

firearm involved in a crime was recovered to protect the privacy interests of individuals

who live or work at or near that location. The location where a firearm was recovered

may be part of the crime scene or may concern the home or business address of the

victim, suspect, witness, or an acquaintance thereof. However, ATF does not know

whether the individuals who live or work near the recovery location have any connection

to the crime other than the recovery of the firearm. For example, if a firearm is recovered

in front of the home of an individual, it may be that this individual has no connection to

the firearm and that the criminal dropped or hid the gun on this individual's property. If

---

[13]Purchaser Involved in Multiple Sales Data consists of 11 data elements:  Last Name, Middle
Name, First Name, Name Suffix, Route Number, Apartment Number, Street Number, Street
Direction, Street Name, Street Suffix, and Zip Code.  See Pl.'s Bill Req. 83-86, 93-98, 102.

ATF were to disclose the address of where firearms involved in traces were recovered, this individual could find himself wrongly linked in the public eye to the crime committed with the firearm. Given this individual's innocence in this example, such an association could subject him to considerable embarrassment and harassment.

69. Protection under Exemption 7(C) is necessary to protect the people who may live or work at the specific addresses listed in this category. Although the person(s) at the listed address may have been wholly unconnected to the crime, the mere mentioning of a person's specific identifying information in a law enforcement file, such as Recovery Location Data, can reasonably be expected to invade an individual's privacy.

70. Against these privacy interests, ATF has balanced any possible "public interest" in the Recovery Location Data, as that term has been interpreted by the Courts. The Recovery Location Data is of minimal, if any, public interest because the disclosure of the data tells the public nothing about the operations of ATF. Indeed, very little of the data concerns ATF investigations but rather those of the 17,000 other Federal, State, local, and international law enforcement agencies that submit trace requests to ATF. In light of the absence of any public interest in these addresses, the protection of privacy interests under Exemption 7(C) prevails.

Possessor and Associates Data

71. For similar reasons, ATF withholds the Possessor and Associates Data under Exemption 7(C). The privacy interests of possessors and associates data in their names and addresses outweigh the negligible light this information sheds upon the operations of government. The public release of this information could subject the persons named to harassment and stigma. The possessor of the firearm ultimately may be exonerated in the course of a criminal investigation. Even if the police and/or judicial systems have

cleared the possessor of any wrongdoing, the mere mentioning in a law enforcement file may subject the one-time suspect to harassment and embarrassment.

72. Furthermore, the "associates" listed may become or may have been crucial government witnesses or informants in an investigation. Revealing their names could lead to harassment and intimidation by those who would prefer the associate not cooperate with investigators or to false allegations of the person's guilt.

73. In addition, because the agency requesting the trace does not inform ATF of whether possessors and their associates are ever indicted or convicted of any offense, ATF has no way of knowing whether the law enforcement agency requesting the trace believes the possessor or associate to have had any role in the crime. Possessor and associate names and addresses are often mentioned in the Trace Database Sub-Module simply because they were the last known possessor of the traced firearm or an associate of such person. These individuals simply could be innocent third parties in the wrong place at the wrong time. Given the lack of public interest in the names and addresses of possessors and associates whose relationship to the investigation is unknown, the balance under Exemption 7(C) justifies withholding of these data.

Purchaser Identification Data

74. The Purchaser Identification Data, which consists of the names and addresses of purchasers of traced firearms, are also entitled to protection under Exemption 7(C). This category of data identifies the original purchaser of the gun involved in a crime, even if that purchaser had no connection to the crime whatsoever. Thus, a person who purchased a firearm legally in 1993 and sold the gun in 1995 would appear in the Trace Database Sub-Module as a purchaser, even if the firearm were recovered in a crime and submitted for a trace in 2000. The purchaser does not necessarily have any connection to the crime

or to the investigation other than at one time having purchased the traced firearm. Revealing the names of these potentially law-abiding citizens jeopardizes their legitimate privacy interests, as they simply may have engaged in the entirely legal conduct of purchasing a firearm that ended up in the wrong hands at some later time. The association of such an individual with a crime involving a firearm, which the public may infer from the data, could lead to embarrassment and stigma for the purchaser. These are the very kinds of concerns that motivated Congress to enact the above-referenced appropriations restrictions.

Purchaser Involved in Multiple Sales Data

75. As with the Trace Database Sub-Module data discussed above, ATF never releases the Purchaser Involved In Multiple Sales Data from the Multiple Sales Database Sub-Module under the FOIA because the minimal public interest in the disclosure of this personal information does not outweigh the substantial privacy interests at stake.

76. The purchase of multiple firearms does not by itself constitute illegal activity in any way. However, ATF monitors this information as part of its long-term efforts to track illegal sales and trafficking patterns throughout the country. Revealing the names and addresses of those persons who have engaged in the entirely legal activity of purchasing multiple handguns would inevitably anger these law-abiding citizens and compromise the legitimacy of ATF as an agency that can be entrusted to maintain the confidentiality of its records.

77. Additionally, the privacy interests at stake are not outweighed by the public interest in the disclosure of the information. There is little public interest in the disclosure of names and addresses of citizens who have legally purchased firearms, as this information does not shed any light on ATF's conduct.

ATF's Withholdings Under FOIA Exemption 6
For Data From the Trace Database and Multiple Sales Database Sub-Modules

78.    ATF invokes Exemption 6 to protect the same categories of data from the Trace Database

Sub-Module and the Multiple Sales Database Sub-Module that are protected under

Exemption 7(C):  Recovery Location Data, Possessor and Associates Identification Data,

Purchaser Identification Data, and Purchaser Involved in Multiple Sales Data.

Exemption 6 protects from disclosure "personnel and medical files and similar files the

disclosure of which would constitute a clearly unwarranted invasion of personal privacy."

5 U.S.C. § 552(b)(6).  With respect to the Recovery Location Data, Possessor and

Associates Identification Data, Purchaser Identification Data, and Multiple Sale

Purchaser Identification Data, ATF believes that the third parties' privacy interests in

their names and addresses greatly outweighs the minimal public interest in the data.

Moreover, there is no reason to believe that the public will obtain a better understanding

of the workings of ATF by learning the names and addresses of private citizens who

purchased or possessed a firearm involved in a trace, resided or worked where a traced

firearm was recovered, or purchased a firearm as part of a multiple sale.  Given the

absence of any public interest in the data combined with the potential association of these

individuals with wrongdoing, the release of the aforementioned data would constitute a

clearly unwarranted invasion of privacy.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on the _9th_ day of _Nov_ 2000.

David L. Benton
Assistant Director,
Field Operations
Bureau of Alcohol, Tobacco
and Firearms

APPENDIX    C

Case 1:02-cv-03029-JBW-CLP Document 89 Filed 04/30/04 Page 58 of 74 PageID #: 625

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - -x

NATIONAL ASSOCIATION FOR ADVANCEMENT
OF COLORED PEOPLE, NAACP, et al.

            Plaintiffs,

                                   Civil Action
                                   No. CV-99-3999

     - against -

                                   (Weinstein, J.)
                                   (Pollack, M.J.)

A.A. ARMS, et al.

- - - - - - - - - - - - - - - - - -x
            Defendants.

NATIONAL ASSOCIATION FOR ADVANCEMENT
OF COLORED PEOPLE, NAACP, et al.

            Plaintiffs,

                                   Civil Action
                                   No. CV-99-7037

     - against -

ACUSPORT CORP., et al.          (Weinstein, J.)
                                   (Pollack, M.J.)

- - - - - - - - - - - - - - - - - -x
            Defendants.

Pedro J. Perez, as his declaration, pursuant to 28 U.S.C.
§ 1746, states:

1. I am the Assistant Deputy Superintendent for the
New York State Police. In this position, my
responsibilities include supervision of the Bureau of
Criminal Investigation. I have been with the New York
State Police for 20 years. I have had extensive experience
in criminal investigations involving firearms throughout my

career. I have also supervised a wide range of criminal investigations involving the unlawful use of firearms.

2. A significant investigative tool for the New York State Police, in these investigations, is the tracing of firearms by the Bureau of Alcohol, Tobacco, and Firearms (ATF), which assists our police officers in identifying individual armed criminals for prosecution, developing proactive local investigative and strategic analysis to target armed violent criminals and gun traffickers for prosecution, and attempting to place local crime guns in a regional and national strategic enforcement context.

3. The Bureau of Alcohol, Tobacco, and Firearms (ATF) provides firearms tracing services in support of criminal investigations to our Department. Officials at the ATF's National Tracing Center's Crime Gun Analysis Branch enter information provided when our Department requests ATF to trace firearms suspected of being involved in a crime.

4. As noted in its August 14, 2000 response to the subpoena, ATF currently provides the general public most firearms trace data, but withholds selected information to shield the full results of each trace report provided to law enforcement officers for their investigations. If ATF were to fully disclose the firearms tracing information sought by subpoena in this case, criminals, who are

obviously familiar with their unlawful activities, would be given virtually contemporaneous access to the information used by police to identify which firearms dealers and individuals should be investigated. The chances for success of any current or prospective firearms-related investigations would be severely compromised when information about crime guns traced by ATF are contemporaneously released to the general public.

5. Clearly, if a criminal is able to prematurely obtain the ATF-compiled trace investigation data, ongoing criminal investigations will be compromised and the lives and safety of law enforcement personnel will be jeopardized. The consequences of disclosure are too grave to rely on safeguards currently in place, such as "do not contact" codes, to protect law enforcement personnel who may be working undercover or in any other pre-arrest capacity. These concerns are especially significant given that the techniques to protect law enforcement personnel from harm at the hands of criminals were developed based on the ATF disclosure policy that has been in effect for many years.

6. For example, if an individual were able to discern from ATF's trace data that a specific firearm is the subject of an ongoing investigation, the individual would

Case 1:02-cv-03029-JBW-CLP  Document 86  Filed 04/30/04  Page 61 of 74 PageID #: 628

be "tipped off" that there could be undercover law enforcement personnel working on the case. The individuals who are connected to the crime gun could easily see what guns were recently traced. If they see the specific weapon they just sold in the firearms trace database, then it is a strong indication it was sold to an undercover agent, which could imperil both the undercover agent and the investigation. If the individual were not informed that a particular firearm was the subject of an ongoing law enforcement investigation or ATF trace, that individual would have no reason to be suspicious or to change his or her behavior. The same concerns are easily applied to cooperating witnesses and informants who, my experience has shown, are often in grave danger if their cover is blown.

7. It is also easy to see how contemporaneous disclosure of firearms trace data could adversely affect high-profile law enforcement efforts. For example, I have been informed that the investigation into the purchase of the firearms used in the Columbine massacre was potentially compromised by the premature release of firearms trace data. I have also been informed that ATF has received numerous requests for trace data relative to actor Robert Blake, who has been charged with the murder of his wife, both before and after his arrest, which could have

Case 1:02-cv-03029-JBW-CLP   Document 86   Filed 04/30/04   Page 62 of 74 PageID #: 629

compromised that murder investigation. Contemporaneous requests for firearms trace data would be commonplace and the potential for interference in investigations, high profile and otherwise, would be great if ATF were required to prematurely release firearms trace data.

8. The tracing of crime guns is an important component of my Department's partnership with ATF to reduce firearms violence. My Department works with ATF in analyzing firearms trace data to solve firearms related crimes, ranging from homicide to firearms trafficking. We use trace data to link a suspect to a firearm-related criminal investigation, to identify any potential firearms traffickers, and to detect patterns in the sources and kinds of firearms that are used in a crime. It is my experience that criminals easily and frequently change their modus operandi if they believe law enforcement is watching them. For example, the knowledge that law enforcement is examining firearms that a firearms trafficker either purchased him or herself or had purchased for them would clearly lead them to change their methods and possibly allow them to avoid detection.

9. I agree with the concerns expressed by the Fraternal Order of Police and the International Association of Chiefs of Police that many police departments will

seriously examine whether to continue to provide this valuable gun tracing information to the ATF firearms trace database if ATF is not allowed to maintain firearms trace data in confidence for at least a certain period of time to allow for those agencies to control their investigation, prevent suspects from eluding detection and intimidating witnesses, and avoid the premature release of evidence. Because of the sheer volume of trace requests that are received by the ATF and requested by police departments, it would not be possible to monitor the status of each pending criminal investigation associated with each firearm that is traced. Unless ATF is working an investigation with another agency, there is no law enforcement reason for ATF to do so. It is a standard operational security practice in the law enforcement community that shared investigative information that could compromise a criminal case is not disclosed without the specific authorization of the originating investigating agency and my Department believes that ATF's firearms trace data disclosure policy sufficiently secures operational security for my Department's firearms traces.

I declare under penalty of perjury that the forgoing is true and correct to the best of my knowledge. Executed on the 10th day of July 2002.

APPENDIX   D

Case 1:02-cv-03029-JBW-CLP   Document 86   Filed 04/30/04   Page 66 of 74 PageID #: 633

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - -X

NATIONAL ASSOCIATION FOR ADVANCEMENT
OF COLORED PEOPLE, NAACP, et al.

     Plaintiffs,   Civil Action
            No. CV-99-3999

   - against -
          (Weinstein, J.)
          (Pollack, M.J.)

A.A. ARMS, et al.

     Defendants.
- - - - - - - - - - - - - - - - - -X
NATIONAL ASSOCIATION FOR ADVANCEMENT
OF COLORED PEOPLE, NAACP, et al.

     Plaintiffs,   Civil Action
            No. CV-99-7037

   - against -
          (Weinstein, J.)
ACUSPORT CORP., et al.    (Pollack, M.J.)

     Defendants.
- - - - - - - - - - - - - - - - - -X

Harold Litwin, as his declaration, pursuant to 28 U.S.C.

§ 1746, states:

  1.  I am the Chief of Operations for the City of

Buffalo Police Department.  In this position, my

responsibilities include overseeing the City of Buffalo

Police Department's Detective Division.  I have been with

the City of Buffalo Police Department for 34 years.  I have

supervised a wide range of criminal investigations
involving the unlawful use of firearms.

2.  A significant investigative tool for the City of
Buffalo Police Department in these investigations is the
tracing of firearms by the Bureau of Alcohol, Tobacco and
Firearms (ATF), which assists our police officers in
identifying individual armed criminals for prosecution,
developing proactive local investigative and strategic
analysis to target armed violent criminals and gun
traffickers for prosecution, and attempting to place local
crime guns in a regional and national strategic enforcement
context.

3.  I submit this declaration to oppose plaintiffs'
motion to compel the Bureau of Alcohol, Tobacco and
Firearms (ATF) to respond to a Rule 45 subpoena for
documents and information from its Firearms Tracing System
(FTS).  ATF provides firearms tracing services in support
of criminal investigations to our Department.  Officials at
the ATF's National Tracing Center's Crime Gun Analysis
Branch enter information provided when our Department
requests ATF to trace firearms suspected of being involved
in a crime.

4.  As noted in its August 14, 2000 response to the
subpoena, ATF currently makes available provides the

general public most firearms trace data, but withholds
selected information to shield the full results of each
trace report provided to law enforcement officers for their
investigations.  If ATF were to fully disclose the firearms
tracing information sought by subpoena in this case
criminals, who are obviously familiar with their unlawful
activities, would be given virtually contemporaneous access
to the information used by police to identify which
firearms dealers and individuals should be investigated.
The chances for success of any current or prospective
firearms-related investigations would be severely
compromised when information about crime guns traced by ATF
are contemporaneously released to the general public.

    5.  Clearly, if a criminal is able to prematurely
obtain the ATF-compiled trace investigation data, ongoing
criminal investigations will be compromised and the lives
and safety of law enforcement personnel will be
jeopardized.  The consequences of disclosure are too grave
to rely on safeguards currently in place, such as "do not
contact" codes, to protect law enforcement personnel who
may be working undercover or in any other pre-arrest
capacity.  These concerns are especially significant given
that the techniques to protect law enforcement personnel
from harms at the hands of criminals were developed based

3

on the ATF disclosure policy that has been in effect for
many years.

6. For example, if an individual were able to discern
from ATF's trace data that a specific firearm is the
subject of an ongoing investigation, the individual would
be "tipped off" that there could be undercover law
enforcement personnel working on the case. The individuals
who are connected to the crime gun could easily see what
guns were recently traced. If they see the specific weapon
they just sold in the firearms trace database, then it is a
strong indication it was sold to an undercover agent, which
could imperil both the undercover agent and the
investigation. If the individual were not informed that a
particular firearm was the subject of an ongoing law
enforcement investigation or ATF trace, that individual
would have no reason to be suspicious or to change his or
her behavior. The same concerns are easily applied to
cooperating witnesses and informants who, my experience has
shown, are often in grave danger if their cover is blown.

7. It is also easy to see how contemporaneous
disclosure of firearms trace data could adversely affect
high-profile law enforcement efforts. For example, I have
been informed that the investigation into the purchase of
the firearms used in the Columbine massacre was potentially

compromised by the premature release of firearms trace data. I have also been informed that ATF has received numerous requests for trace data relative to actor Robert Blake, who has been charged with the murder of his wife, both before and after his arrest, which could have compromised that murder investigation. Contemporaneous requests for firearms trace data would be commonplace and the potential for interference in investigations, high profile and otherwise, would be great if ATF were required to prematurely release firearms trace data.

8.   The tracing of crime guns is an important component of my Department's partnership with ATF to deduce firearms violence. My Department works with ATF in analyzing firearms trace data to solve firearms related crimes, ranging from homicide to firearms trafficking. We use trace data to link a suspect to a firearm-related criminal investigation, to identify any potential firearms traffickers, and to detect patterns in the sources and kinds of firearms that are used in a crime. It is my experience that criminals easily and frequently change their modus operandi if they believe law enforcement is watching them. For example, the knowledge that law enforcement is examining firearms that a firearms trafficker either purchased him or herself or had purchased

5

for them would clearly lead them to change their methods
and possibly allow them to avoid detection.

9.  I agree with the concerns expressed by the Fraternal
Order of Police and the International Association of Chiefs
of Police that many police departments will seriously
examine whether to continue to provide this valuable gun
tracing information to the ATF firearms trace database if
ATF is not allowed to maintain firearms trace data in
confidence for at least a certain period of time to allow
for those agencies to control their investigation, prevent
suspects from eluding detection and intimidating witnesses,
and avoid the premature release of evidence.  Because of
the sheer volume of trace requests that are received by the
ATF and requested by police departments, it would not be
possible to monitor the status of each pending criminal
investigation associated with each firearm that is traced.
Unless ATF is working an investigation with another agency,
there is no law enforcement reason for ATF to do so.  It is
a standard operational security practice in the law
enforcement community that shared investigative information
that could compromise a criminal case is not disclosed
without the specific authorization of the originating
investigating agency and my Department believes that ATF's

6

firearms trace data disclosure policy sufficiently secures operational security for my Department's firearms traces.

I declare under penalty of perjury that the forgoing is true and correct to the best of my knowledge.  Executed on the 3rd day of July 2002.

7/3/02

7

<u>D E C L A R A T I O N</u>

<u>Vanessa Lee</u>, hereby declares and states as follows:

That on the 30th day of **April - 2004**, I delivered by Federal Express mail pick-up station  at One Pierrepont Plaza, Borough of Brooklyn, County of Kings, City and State of New York, the following:

**BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES' SUPPLEMENTAL MEMORANDUM OF LAW IN OPPOSITION TO SUBPOENA AND INFORMAL DISCOVERY REQUESTS**

of which the annexed is a true copy, contained in a securely enclosed postpaid wrapper directed to the person(s) at the place(s) and address(es) as follows:

**Leonard Rosenbaum, Esq.**
**Renzulli Pisciotti & Renzulli, LLP**
**310 East 42nd Street**
**New York, New York 10017-5947**

**Paul L. Kassirer, Esq.**
**Lester Schwab Katz & Dwyer, LLP**
**120 Broadway**
**New York, New York 10271-0071**

**Kenneth Marder, Esq.**
**Taub & Marder**
**450 Seventh Avenue, 37th Floor**
**New York, New York 10123**

**Eric Proshansky, Esq.**
**Assistant Corporation Counsel**
**NYC Law Department**
**100 Church Street**
**New York, NY 10007**

2

**Elisa Barnes**
**20 Exchange Place**
**New York, New York 10005**

The undersigned affirms under penalty of perjury that the foregoing is true and correct.

Dated:     Brooklyn, New York
           April 29, 2004


_____
           Vanessa Lee