UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------x
JOAN TRUMAN SMITH,

               Plaintiff,          02 Civ 3029 (JBW)

      -against-

BRYCO ARMS, et al.

              Defendants.
--------------------------------------------------------x

### BRIEF ON BEHALF OF PLAINTIFF JOAN TRUMAN SMITH
### IN OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGEMENT

*Introduction*

      Plaintiff Truman Smith has adduced evidence on each element of her public

nuisance and negligence claims entitling her to prevail in these motions for summary

judgment.  Admissible evidence presented here demonstrates that defendants negligently

and intentionally sold the .380 caliber Bryco pistol used to kill plaintiff, thereby

breaching their duty of care and causing damage to plaintiff.  Defendants created and

contributed to a public nuisance that specifically harmed plaintiff Truman Smith in the

manner of their merchandising of the Bryco .380 caliber pistol used in the shooting of

plaintiff's decedent.  The public nuisance created by defendants was the proximate cause

of plaintiff's harm, for which defendants are jointly and severally liable.

      Sharply contested issues of material fact require a full trial of plaintiff's claims.

Statement of the Case

      Plaintiff Truman Smith commenced this action by the filing of a summons and

complaint on May 21, 2002.  Defendant Atlantic Gun & Tackle (hereafter "Atlantic")

answered on August 20, 2002; defendant AcuSport Corporation (hereafter "AcuSport")

1

answered on September 30, 2002. Individual defendants Bruce Jennings and Janice Jennings successfully moved to dismiss plaintiff's claims against them. A Suggestion of Bankruptcy was filed on behalf of defendants Bryco Arms and B.L. Jennings, staying proceedings against them in this case on May 23, 2003.

This action was joined to Jacquoine Johnson v. Bryco Arms, et al., 03 Civ 2582 (JBW) on March 4, 2004. Both plaintiffs successfully moved to amend their complaints to add claims for punitive damages. Order, October 22, 2004. (Ex. A., Amended Complaint)

Defendant Atlantic Gun & Tackle moved to dismiss on the grounds of lack of personal jurisdiction on May 5, 2004 and renewed its motion in March 2005. This Court denied that motion by Order and Decision dated April 1, 2005.

Discovery proceeded before Magistrate Judge Cheryl Pollak. Documents and depositions of the parties have been exchanged and conducted; expert witness discovery has also been exchanged and depositions of the experts conducted pursuant to Rule 26 and 30 of the Federal Rules of Civil Procedure.

Defendants move now at the close of discovery and before trial for summary judgment pursuant to Rule 56.

Facts

This case arises out of the murder of five employees and the wounding of two others at the Wendy's fast food restaurant located at 40-12 Main Street, Flushing, New York on May 26, 2000. Referred to as the "Wendy's Massacre", this was one of the most horrific shootings in recent New York memory. The shootings by John Taylor and Craig Godineaux with a Bryco Arms, .380 caliber pistol bearing serial number 1032592

2

took the lives of five innocent workers: plaintiff Anita Smith, Jeremy Mele, Ali Ibadat, Raymond Nosario, and Jean Auguste.  Two other workers, Jacquoine Johnson, formerly a plaintiff in the companion case and Patrick Castro were shot and survived. (Ex. A)

A)      Atlantic's Sale of the Bryco .380 Pistol  to Bernard Gardier

The Bryco .380 caliber pistol used in these shootings was negligently sold by William Borsellino, owner of defendant Atlantic Gun & Tackle, on March 19, 1999 to Bernard Gardier a prohibited purchaser.  This gun passed, within a matter of weeks, into the "underground market" where it was purchased by John Taylor and used on May 25-6, 2000. (Ex.A)

Bernard Gardier, the purchaser of the subject firearm, had a prior conviction for drug trafficking and was prohibited from buying a gun under Ohio law. See Ohio St. § 2923.13 (Ohio Rev. Code Ann. 2005). (Ex. C Gardier Dep at 50-1) Nevertheless, Atlantic's owner, William Borsellino, sold Gardier the subject firearm, and permitted Gardier's fiancé Angela Freeman to complete the required paperwork consisting of an ATF Form 4473. (Ex. E, 4473 Form, 3/19/99)

i)      the recognized safe sale standard

This negligent, wrongful and "straw sale" violated ATF and industry safe sales guidelines.  (Ex. F, ATF FFL Newsletters; Ex.G, National Shooting Sports Foundation (NSSF) Don't Lie for the Other Guy Program materials; Ex. H, Deposition of Joseph Vince at 36-7.)

Straw sales are described by ATF with the following scenario: "the actual buyer uses the straw purchaser to execute the Form 4472 purporting to show that the straw purchaser is the actual purchaser of the firearm.  In some instances, a straw purchaser is

3

used because the actual purchaser is prohibited from acquiring the firearm."(Ex. R, Report

of Joseph Vince, plaintiff's expert and former ATF administrator, at 4, n.2). In its

publication and video, "Don't Lie for the Other Guy", the firearms' industry shows

several scenarios involving two people attempting to consummate a straw purchase.

These materials show scenarios designed to help dealers identify straw purchasers. In

each situation, the person paying the money is deemed to be the actual purchaser. (A

copy of the Video "Don't Lie for the Other Guy" is available for viewing by the Court.)

This wrongful and dangerous sale not only violated federal regulatory and

industry standards, it violated defendant's own definition of a proper sale. William

Borsellino, the long-time owner of Atlantic Gun & Tackle, testified at his deposition, as

follows:

> Q.    In the situation where a young man
>        is the one who had handled it and sort of was
>        getting a feel of it, seeing how it fit into
>        his hand, would you have taken note of that,
>        which one of the two parties was handling the
>        gun?
>
> A.    Yes.
>
> Q.    Why would you have done that?
>
> A.    Because I'm always -- when
>         there's -- when there's two people at the
>        counter, I want to make sure who's actually
>        going to be buying the gun.
>
> Q.    Okay. And why is that important to
>        you?
>
> A.    Because I don't want to make a
>        straw sale.
>
> Q.    And what do you define as a straw
>        sale?

4

A.     A straw sale is if the man is
       looking at the gun and he says okay, we'll take
       it and she's going to fill out the form,
       good-bye. We don't make the sale. That's a
       straw sale. That's an out and out straw sale.

       He's buying the gun. He wants the
       gun, but he wants her to fill out the paperwork
       out. We do not do that. We've been -- we've
       seen that many, many times and we do not allow
       it. It's an illegal procedure and it's a
       definite no in our store.

(Ex. I, Deposition of W. Borsellino, at 40-41)

Here, the evidence discloses that just before March 19, 1999, Gardier was

threatened by a drug addict at the drug store where Gardier was employed as an assistant

manager. (Ex. C at 38) He believed he needed a gun immediately and his

girlfriend/fiancé Angela Freeman would not give him the illegal, "dirty" gun she kept at

her job in a Cleveland municipal recreation center. (Ex. C at 71-2; 76-77) Accordingly,

he got Angela to agree to complete the paperwork on the gun purchase because he had a

prior drug conviction and had been told that he would have trouble passing a NICS

check. (Ex. C at 86-87) He and Freeman went to Atlantic Gun & Tackle together, looked

at guns and Gardier selected the .380, having concluded that he wanted a gun with

sufficient power. (Ex. C at 90) After handling the gun, Gardier placed cash covering the

amount of the purchase of the gun and a box of ammunition on the counter or handed it to

Angela Freeman in front of William Borsellino. Angela Freeman then completed the

paperwork. (Ex. C at 93; 95-6; 97; 350; Ex. B at 30; 36)

ii) the real purchaser and the straw purchaser

Bernard Gardier, the purchaser, testified that he needed a gun because he had

been threatened by a customer at the drug store where Gardier was a manager. (Ex. C at

70-2.) He felt he needed a gun quickly and asked his fiancé Angela Freeman to use the gun she kept in her locker at the Cleveland Recreation Center. (Ex. C at 72-6) She declined because the gun she owned was "dirty." (Ex. C. at 72) She told Gardier that the gun was not registered to her, that she didn't know what had happened to it and "I don't want you to get caught with this gun and then something bad happen to you. She said, let's go out… and buy one together." (Ex. C. at 72)  He testified further about this "dirty" gun:

Q: Did she tell you where she got the gun that she kept in her locker?

A: She told me – I don't know where she got it. She didn't tell me where, but all I know is that she had it and it wasn't registered in her name and it could have been used to rob somebody or shoot, no one knew what happened with the gun."

(Ex. C. at 76.) Freeman demonstrated her extensive knowledge of the potential problems surrounding getting caught with a gun with a history, or alternatively, being the purchaser of a gun that goes out into the world and gets a history. Accordingly, after Gardier did not return immediately from New York, Freeman contacted the Cleveland police department to report that the gun had been stolen. (Ex. B at 38) She did this because she wanted to protect herself and her daughter. (Ex.B at 77: "I don't want the gun to come back that Angela had anything to do with it. That was my main concern in making the police report" and 240: "No. I really just protecting myself with my future husband, but I got a daughter to raise. I was protecting myself.") Reporting a gun stolen is a well known technique for throwing off a trace; that is, disassociating oneself as the recorded purchaser from any future criminal conduct with the gun by persons to whom the gun has been transferred illegally.

6

In addition to this "dirty" gun, Freeman had another gun which was confiscated in

a police action in 1997. (Ex. B at 28)

Unable to get Angela Freeman to give him her illegal gun kept in a locker at a

Cleveland recreation department facility, Bernard Gardier agreed to purchase a gun but

knew that he <u>would</u> not be able to complete the paperwork because he had a prior drug

conviction. (Ex. C at 86-7) He testified as follows:

Q:      ...did you discuss with Angela that you wanted the gun quickly.

A.      Yes.

Q:      And did you discuss with Angela your belief that you would have a harder
time than she would in buying the gun?

A:      Did we discuss that? You know, I figured it may have been a chance that
there would be some delay.  I thought that – I thought that if I went in there and
bought the gun, I figured that I would eventually get it, but I thought that it may
be a day or two before they finally checked everything out, because my
impression was that if you had a felony, you could not buy a gun.

        And ...when I took a plea bargain ...in 1996, the original charge was
felony, but it was reduced to a misdemeanor.  And I've been told that when
people have done background checks on me that it has come back a felony... So I
figured that that would probably be an issue that would hold some things up.

Q       And you didn't want to be held up, correct?

A:      No.

Q:      So, speed was important to you?

A:      Yes.

Q:      Did Angela agree to be the named purchaser of the gun?

A:      Yes.

(Ex. C, Gardier Dep. at 86-7) (objections and comments by counsel omitted.)  Gardier

testified that he wanted a  gun that was affordable, but also one with enough power to do

7

damage. (Ex. C at 90) Gardier testified that he had previously used a .380 pistol. (Ex. C, 89)  Freeman referred to the subject pistol to ATF and to defendants' investigators as a "25", that is, a .25 caliber gun. (Ex. B at 102-4)

In both Gardier and Freeman's description of the purchase of the firearm, Gardier hands the price of the gun, that is $125, to Angela Freeman in the store in the presence of the salesperson, William Borsellino.  (Ex. B at 170-1; Ex. C at 95) In addition, Gardier testified that he handled the firearm before handing the $125 to Freeman. (Ex. B at 93-94)  Neither Gardier nor Freeman recalled any conversation between Borsellino and themselves.

The suggested retail price of the gun was $96.  (Ex. K at 287).  The wholesale price paid by Atlantic to AcuSport was $57.80. Id.  William Borsellino testified that some times defendant set the price higher than the suggested and sometime lower.  He testified that $169 (the price reported for the gun in various press stories) was not accurate, but that the price would have been lower. (Ex. I at 66) Samuel Borsellino testified that the price of the Bryco could not have been $200.  It could have sold for $100. (Ex. K at 289-90)  With a box of ammunition Freeman states they purchased, retailing at $ 10-14 per box, the total price would have been about $116 (Ohio had 7% sales tax in 1999) Gardier testified he handed Freeman $125 in cash.  Freeman and Gardier did not split the cost of the gun: the evidence demonstrates that in paying $125, Gardier paid for the gun and a box of ammunition.  He paid for the gun because it was his.

## B.  Atlantic's Crime Gun Sales

Atlantic Gun & Tackle is a family-owned firearms and sporting goods business, started by the father of the current owners, with two retail outlets in the suburban

8

Cleveland area. It is a privately held corporation, incorporated in Ohio. The shares are held by two brothers, Samuel Borsellino, vice president of the corporation, and William Borsellino, president. (Ex. K at 17-20; Ex. I at 11) The corporation lists annual gross revenue hovering around $1 million for the last few years. The subject gun was sold at the Bedford Heights store, which has been owned by the Borsellino family since 1959. The other retail outlet is located in Breckville Ohio and has been owned by the Borsellino family since 1985. Samuel and William Borsellino work in the Bedford Heights store. They employ two other employees, Gary Hill and Michael Sidaway, an evening and weekend manager. Samuel Borsellino has worked in the store full time for over 30 years. (Ex. K at 23) William Borsellino has worked in the store "in excess of 40 years." (Ex. I at 11)

Atlantic Gun & Tackle has been repeatedly cited as one of the worst gun dealers in America. Elizabeth Auster and Patrick O'Donnell, *Bedford Heights Shop in Group's Top Ten for Guns Used in Crime*, Plain Dealer (Cleveland, Ohio), July 17, 2003, at A9; Americans for Gun Safety Foundation, *Selling Crime: High Crime Gun Stores Fuel Criminals*, January 2004, http://www.agsfoundation.com/reports.html In 2000 Atlantic was placed on ATF's list of 480 problem dealers (out of a universe of 100,000 dealers) with 10 or more young crime gun traces (that is, traces with a time-to-crime of less than 3 years).(Ex. J, ATF Demand Letter) Atlantic also appears as dealer 595 on the list of 1559 problem dealers prepared by Lucy Allen in NAACP v. AcuSport. Despite these citations for problem sales, Atlantic has implemented no safe sales policies. It has no written policies (Ex. M, Deposition of Gary Hill at 58) and provides no training to sales staff. (Ex. M at 114-15) Atlantic does not and never has analyzed or even retained crime gun

9

trace records. (Ex. K at 233.) No one at Atlantic reviews its sales practices in connection with these crime gun records. (Ex. M at 91-96) Evidence demonstrates that virtually any sale is acceptable to Atlantic: there were numerous instances of multiple sales and repeat crime gun sales in the limited acquisition and disposition (A & D) records produced by defendant, Atlantic. (Ex. L ).

Like other members of the firearms industry, Atlantic denies that crime gun traces even relate to crimes. (Ex. I, 84-90; Ex. K at 57-60; Ex. M at 65-80) Defendants' witnesses (four from Atlantic and 2 from AcuSport) were all apparently extensively prepped to mechanically repeat over and over 'a traced gun is not a crime gun.' When questioned about the basis of that knowledge, not one of them could provide one source other than the chimerical "ATF agent" or "an ATF document". None had read any of the Youth Crime Gun Interdiction Initiative studies, or any other ATF study available to the industry and public (e.g. Following the Gun, Commerce in Firearms 2000).

There are no procedures in place at Atlantic Gun & Tackle for identifying a straw purchaser. Each of the two principals and the two store clerks testified essentially that 'I know a straw purchase when I see one.' (Ex K at 267-8; Ex. I at 80) When pressed, defendants discussed asking questions of the straw purchaser/trafficker; the questions proposed by defendants were simply exculpatory and consisted of variations on the question: "are you the real purchaser?" (Ex. K at 268-9) Defendant's demonstrated lack of commitment to identifying and preventing straw sales results in Atlantic's high ranking of crime guns to sales. (Ex. S Allen Report at 18, Attachments E&F)

Further, both Borsellinos denied knowing what a firearms trafficker is or how one operates. William Borsellino testified as follows:

10

Q:     Do you acknowledge that guns are trafficked.

A:     I'm sure they probably are.

Q:     Do you believe they are?

A:     I haven't really given it much thought. I don't know anything about it.

(Ex. I, at 106.) In a similar vein, Samuel Borsellino testified that

Q:     So you don't acknowledge that guns are trafficked in America, correct?

A:     Not to my knowledge.  They may be. I have no awareness of that.

Q:     You have no knowledge?

A:     No. I don't.

(Ex. K at 178)  These admissions explain Atlantic's large number of repeat sales of crime guns and the number of multiple crime gun sales. (Exhibit L)

Defendant's 'hear no evil see no evil' gun sale policy has resulted in the documented sale of over 800 traced crime guns in the four year period between 1996 and 2000. (Ex. S, Allen Attachment G-1)  These traced crime guns are obviously a small percentage of the total number of crime guns Atlantic is responsible for sending into the underground market. (Ex. S Allen Report at 5: "Since these guns represent only guns used in crimes that were subsequently recovered, they represent only a fraction of the total number of guns used in crime.")

Defendant claims that its crime gun sales are solely explainable by its claim to "high volume". (Ex. I at 83-84; Ex. D, Deposition of Expert Alford at 153-5)  Defendant and its experts define "high volume" as sales over 50 guns a year, based on an unrelated ATF compliance review worksheet. Plaintiff's expert—a high level career ATF agent— had never heard of an ATF definition of 'high volume.' (Ex. H. Deposition of Joseph

Vince at 315) Further, as Mr. Vince testified, with sales of approximately 1000 firearms per year, Atlantic is not a high volume dealer and there are several larger volume Ohio dealers with few or no traces. (Id.)

Atlantic is, however, a problem dealer, as defined by ATF. Atlantic was selected as one of 480 dealers (out of a universe of 105,000) to be placed on the 'demand program' because Atlantic had 10 and then 15 guns traced to it with a short time to crime (under three years). (Ex J, Demand Letters.) Mr. Vince has indicated that Atlantic was on the road to license revocation. (Ex. H at 221).

Ms. Allen's analysis demonstrates that the number of Atlantic's crime gun sales is statistically related to its dangerous practices. (Ex. S Allen Report at 18: "Atlantic Gun & Tackle is in the worst 5% of dealers for all years 1996 though 200, using both methods of ranking the ratio of traces to sales. See Attachments E and F.")

C.     AcuSport's Relationship with Atlantic

AcuSport is a large national distributor with annual gross sales of close to $20 million. AcuSport has a long standing relationship with Atlantic, one of its 10,000 firearm dealers. AcuSport has no interest in how dangerously Atlantic sells the guns furnished by AcuSport. Its only concern is that Atlantic purchases a lot of AcuSport's products and pays for them promptly. (Ex. O Deposition of William Fraim at 100-02).

AcuSport maintains sophisticated computerized records on its dealers, subjecting each to an analysis based on 41 factors, including: the number of guns sold, the time of payment, the frequency of payment. AcuSport's analysis leads to a numerical factor, assigned to each dealer and upon which commercial decisions regarding that dealer are based. (Ex. N, Deposition of Robert Navarre at 51-62) Notably missing from AcuSport's

12

analysis is a factor dealing with how safely a dealer sells its guns.  Like Atlantic,

AcuSport does not review or keep trace records, does not query the ATF computerized

tracing system, Access 2000, and has not obtained (or retained) the firearms trace

database. (Ex. O, Fraim Dep. at 116-123) Ms. Allen found that the 100 AcuSport dealers

with the greatest number of traces in 1996 "accounted for 63% of the AcuSport traces in

that year.  By 2000, these same 100 dealers accounted for 43 % of the AcuSport traces."

(Ex. S, Allen Report at 15-6.)

    AcuSport has done business with Atlantic for decades. (Ex. O, Fraim Dep. at

168-9) AcuSport does not know—or care to know—anything about Atlantic's sales

practices or why it sells such a large number of guns that quickly end up in the hands of

criminals.  AcuSport makes no effort to discover anything about Atlantic or any of its

distribution partners and has, in the past, refused to involve itself when it has discovered

that one of its dealers has been indicted for criminal gun sales. (Ex O at 175-77)

    Atlantic is in the top 5% of AcuSport's problem dealers, as defined by dealers

with a high percentage of crime guns to sales guns, and in crime guns which exhibit one

of the 12 problem dealer indicators. (Ex. S, Allen Report at 18, Allen Attachments E&F)

D.  Causation

1.    Specific causation

Within two weeks of its wrongful acquisition by Bernard Gardier, the .380 Bryco

was sold in New York City to Bruce Ransom,  to Craig Brockington, Ransom's nephew

and then in May 2000, to the shooter John Taylor. (Ex. P, ATF Investigation Records)

None of these transactions was legal under New York law. See Penal Law § 400.

(McKinney's 2005)  None of the purchasers of the subject pistol, including the shooter

13

John Taylor, lawfully possessed the gun in the City of New York. Id Given the extremely restrictive practices of the New York City Pistol License Office of the NY Police Department, none of these individuals could have obtained a handgun lawfully. (Ex. Q, Fagan Addendum at 6)

Professor Jeffrey Fagan, a noted criminologist and expert in handgun violence in New York City, found that the series of acquisitions of the Bryco .380 gun was typical of the illegal gun acquisition and possession he studied in two New York neighborhoods and "consistent with the social science literature on the multiple known sources of illegal guns." (Ex. Q, Fagan Addendum to Report of March 7, 2005, dated April 1, 2005.)

He also found that the robbery, deaths and injuries of Anita Smith and her co-workers could not have been accomplished without a gun. (Ex. Q, Addendum at 6)

2.    General causation

Ms. Allen's findings put the subject gun into the larger context of the illegal gun market and identify the preventable harm caused by illegal guns. Ms. Allen has scientifically demonstrated that the market of guns used in crime is very large, that guns move quickly from the legal to the illegal market, thus demonstrating the link between the legal and illegal market from which licensed distributors and dealers profit. Like so many crime guns, this one was smuggled from a weak law to a strong law state, in a short time-to-crime (used in the shootings here within 14 months of its retail sale) from one of a handful of problem dealers who has been a problem dealer over a number of years. Ms. Allen's work demonstrates that sales restrictions on dealers would have a demonstrably salutary effect on the number of handgun homicides. (Ex. S, Allen Report at 20, see particularly Allen Ex. 29.)

14

E. Existence of a Public Nuisance

Professor Fagan's work describes the number of crime gun acquisitions and seizures in New York City. (Ex. Q, Fagan Report, see particularly Figures B4-7, Maps)

Ms. Allen's work demonstrates the precise number of crime guns from Atlantic and AcuSport in the State of New York. (Ex. S, Attachment G)

F.     Injuries

Anita Smith was an extraordinary young woman who worked two jobs, assumed responsibility for the care of her young brothers and assisted her mother and father financially in the support of her siblings. She was wholly innocent of any wrongdoing in connection with her death. Anita Smith worked in the afternoons at a social services agency, Quality Services for the Autistic Community (QSAC), where she was a teacher's aide for autistic children. She worked from 3 to 11 at Wendy's Hamburger Restaurant to help her mother with the household expenses, the care of her brothers and to save money for her college education. She had been accepted at York College and was to enroll for the Fall of 2000. Her goal was to become a social worker. (Ex. T, Deposition of Joan Truman Smith at 165-8)

On May 25, 2000, Anita Smith was working at Wendy's from 3 to 11 p.m. She was closing up the store, waiting on the last customers of the evening, when John Taylor followed the manager Jean Auguste down the stairs to the basement where the safe was kept and then ordered the other workers to come down. They obeyed because he had a gun. (Ex. D, Testimony of Jacquoine Johnson at 1287) Taylor and Godineaux bound and then re-bound the seven employees with duct tape and placed bags over their heads.

15

Anita sobbed and screamed with each of the shots fired before the shot that killed her.

(Ex. D, Johnson Testimony at 1303)

## ARGUMENT

Plaintiff Joan Truman Smith has pled and submitted proof on two causes of action

against defendants AcuSport Corporation and Atlantic Gun & Tackle: public nuisance

and negligence. (Ex. A, Amended Complaint)

I.    Public Nuisance

A.    Law

This Court has held that a private right for public nuisance based on

merchandising practices of gun sellers will lie where plaintiff proves:

> 1. the existence of a public nuisance—a substantial interference
>    with a right common to the public;
>
> 2. negligent or intentional conduct or omissions by a defendant that
>    create, contribute to, or maintain that public nuisance; and
>
> 3. particular harm suffered by plaintiff different in kind from that
>    suffered by the community at large as a result of that public
>    nuisance

NAACP v. AcuSport Corp., 271 F. Supp. 2d 435, 48 (E.D.N.Y. 2002). See also Copart

Indus., Inc. v. Consol. Edison Co. of New York, 41 N.Y.2d 564, 567, 374 N.Y.S.2d 169

(1977).

1.    Existence of a public nuisance:

A public nuisance involves a substantial interference with the exercise of a right

common to the public." 532 Madison Ave. Gourmet Foods, Inc. v. Finlandia Center, Inc.

96 N.Y. 2d 280, 292, 727 N.Y.S.2d 49 (2001). This interference can take several forms.

It can

16

- Offend public morals;

- Interfere with "the use by the public of a public place'"

- "endanger" or "injure" the "property, health, safety or comfort" of
  a "considerable number of persons."

Copart, 41 N.Y. 2d at 568; see also 532 Madison Ave., 96 N.Y. 2d at 292; Restatement

(Second) of Torts § 821B, cmt.b ("Public nuisances included interference with the public

health, as in the case of keeping diseased animals or the maintenance of a pond breeding

malarial mosquitoes; with the public safety, as in the case of the storage of explosives in

the midst of a city or the shooting of fireworks in the public in the public streets").

This Court has recognized that "criminal possession and use of handguns in New

York caus[ing] many unnecessary deaths and much unnecessary injury" is a public

nuisance. NAACP, 271 F. Supp. 2d at 449-50. This Court's analysis was recognized by

the Court of Appeals for the Ninth Circuit in Ileto v. Glock, 370 F. 3d 860 (9th Cir.

2003).

a) Application of Law to Facts in this Action

In applying the recognized law to the facts adduced here, Professor Fagan and

Ms. Allen's work demonstrates the existence of a public nuisance in New York, as does

the admitted presence of the subject firearm in this State.

2.      Defendants' Culpable Conduct in Creating the Nuisance

A private plaintiff may recover damages for special harm caused by a gun maker,

distributor or dealer only where it is possible to identify the gun— and by extension,

those who made and sold the gun—used in the shooting of the plaintiff. Johnson v.

Beemiller, 2003 WL 21697025 (E.D.N.Y. 2003). Creation of a public nuisance in the

17

aggregate, that is, without the identification of the wrongdoer and the linking of the
wrongdoers conduct via an identified gun to the harm suffered by the plaintiff, cannot
support a claim against gun makers and sellers. Id. The Johnson case involved a public
nuisance claim against the makers and distributors of .380 caliber guns. No gun was
recovered in the tragic shooting of Thomas Johnson. Id

     In firearm cases, this Court has also held that "[p]ersons who join or participate
in the creation or maintenance of a public nuisance are liable jointly and severally for the
wrong and resulting injury." Johnson v. Bryco Arms, 304 F. Supp. 2d 383, 391 (E.D.N.Y.
2004) citing Simmons v. Everson, 26 N.E. 911, 124 N.Y. 319 (1891); Irvine v. Wood, 51
N.Y. 224 (1872); see also, Warren v. Parkhurst, 186 N.Y. 45 (1906).

     This Court has determined in firearm cases that evidence of fault is required to
prove the second element of a public nuisance claim. See NAACP v. AcuSport, 271 F.
Supp. 2d at 487.

     Where the public nuisance is based on defendants' negligence, the authorities
require proof of the standard negligence elements: duty, breach, causation and damages.
Copart, 41 N.Y.2d at 569 (quoting McFarlane v. City of Niagara Falls, 247 N.Y. 340,
344-45 (1928). The New York Court of Appeals has stated that the duty of due care in
selling handguns requires a "tangible showing that defendants were a direct link in the
causal chain that resulted in plaintiffs' injuries and that defendants were realistically in a
position to prevent the wrongs." Hamilton v. Beretta, 96 N.Y. 2d 222, 234 (2001).

     The duty of a gun dealer is to act as a reasonably prudent seller under the
circumstances. Restatement (Second) Torts § 283 ("The standard of conduct to which
[the actor] must conform to avoid being negligent is that of a reasonable man under like

circumstances."); Splawnik v. DiCaprio, 146 A.D. 2d 333, 540 N.Y.S. 2d 615 (3d Dep't 1989).

The duty of a distributor (or a manufacturer) rests on the obligation to monitor the flow of its guns through the problem dealer in to criminal hands. The "tangible showing of a direct link to trafficking" required by the Court of Appeals is derived from evidence of repeated crime gun sales between distribution partners, unrelated to volume. Hamilton 96 N.Y. 2d at 237, n.5. In other words, as the Court of Appeals has noted, a manufacturer who continues to sell substantial numbers of guns to distribution outlets that send guns to criminals may be liable under a theory of negligent entrustment. See also Earsing v. Nelson, 212 A.D.2d 66, 629 N.Y.S. 2d 563 (4th Dep't 1995); Rios v. Smith, 95 N.Y.2d 647, 722 N.Y.S.2d 220 (2001); Splawnik v. DiCaprio, 246 A.D. 2d at 335 (3rd Dep't 1989).

Intent is demonstrated by evidence that a defendant chose to engage in the harmful activity after being advised of the consequences of the conduct. See Restatement (Second) § 825 cmt. d & illust. ("the first invasion resulting from the actor's conduct may be either intentional or unintentional; but when the conduct is continued after the actor knows that the invasion is resulting from it further invasions are intentional"); NAACP, 271 F. Supp. 2d at 488. Plaintiff need not prove that defendants "acted for the purpose of causing harm to the public; the question is whether a defendant acted or failed to act with awareness that the public was suffering or would suffer injury as a result of its conduct." Id. With regard to the level of intent plaintiff must demonstrate in a public nuisance firearm case, this Court has stated:

> "Intent" does not however, require knowledge that a specific gun sold to a
> specific dealer will be diverted into the illegal market and cause harm to the

public and the NAACP.  It is enough that a manufacturer, importer, or distributor of handguns knows or is substantially certain that its marketing practices have a significant impact on the likelihood that a gun will be diverted into the illegal market and used in crime, and that substantial harm to the public will result.

Id.

That defendants were not charged with a crime in connection with the wrongful sale to Bernard Gardier is irrelevant. Gun selling is virtually unregulated at the federal or state level in Ohio, where this sale took place.  See 18 U.S.C. § 923 et seq.; NAACP v. AcuSport, appendix four, Gun Control in the United States, A Comparative Survey of State Firearm Laws, Open Society Institute (2000)(listing Ohio as a "low ranking state" with a score of 20 out of a possible 100 points indicating that it has weak laws designed to regulate and control the disposition of firearms.)  The lack of statutory authority prohibiting straw sale and the minimal penalties attached to the violations prosecutors are forced to rely on has led to a dearth of prosecutions. See Americans for Gun Safety Foundation, *The Enforcement Gap*: Federal Strategy Neglects Sources of Crime Guns, October 2004 and October 2003. (Both reports are available at http://www.agsfoundation.com/reports.html.) The findings of researchers second the observation by this Court that: "It should be remembered in the context of the instant case that, although the gun industry is in some respects regulated at the federal, state and local levels, the particular marketing and distribution practices engaged in by defendant manufacturers and distributors remain almost wholly unregulated." NAACP, 271 F. Supp. 2d at 485.

Under New York law, negligence duty is not circumscribed by bare adherence to the positive law.  Jemmott v. Rockwell Mfg. Co., 216 A.D. 2d 444, 444-5, 628 N.Y.S. 2d

184, 185 (2d Dep't 1995); Feiner v. Calvin Klein Ltd., 157 A.D. 2d 501, 549 N.Y.S. 2d 692, 693 (1st Dep't 1990).

It is also well settled that otherwise lawful businesses, many of which are permitted and regulated by statute, can still cause and contribute to a public nuisance because of the manner or circumstances in which they operate. See e.g. New York Trap Rock Corp. v. Town of Clarkson, 299 N.Y. 77, 80, 85 N.E. 873 (1949)(quarry operations); Clawson v. Central Hudson Gas & Elec. Corp., 298 N.Y. 291, 83 N.E.2d 121 (1948) (utility operating dam); Hoover v. Durkee, 212 A.D. 2d 839, 840, 622 N.Y.S. 2d 348 (3d Dep't 1995) (auto racetrack); New York v. New St. Mark's Baths, 130 Misc. 2d 911, 497 N.Y.S. 2d 979 (Sup. Ct., N.Y. Co. 1986)(bath house); Hamlin v. Bender, 173 A.D. 996, 159 N.Y.S. 1117 (4th Dep't 1916) (movie theatre); Shaw's Jewelry Shop v.. New York Herald Co., 170 A.D. 504, 507-08, 156 N.Y.S. 651 (1915) aff'd without op. 224 N.Y. 731 (1918)(newspaper business); State v. Monoco Oil Co, 185 Misc. 2d 742, 748-50, 713 N.Y.S.2d 440 (Sup. Ct., Monroe Co. 2000)(asphalt storage facility); City of Rochester v. Premises Located at S. Washington St., 180 Misc. 2d 17, 687 N.Y.S. 2d 523(Sup. Ct. 1998) (nightclub); Town of Preble v. Song Mountain, Inc., 62 Misc. 2d 353, 361-66, 308 N.Y.S. 2d 1001 (Sup. Ct. Cortland Co. 1970)(open air concert); Star Opera Co. v. Hylan, 109 Misc. 132 (County Ct. Delaware Co. 1919)(opera house).

Determination of breach of duty by a defendant is a matter for the finders of fact. See Stepanian v. Rozanski, 195 A.D. 2d 973, 974, 600 N.Y.S. 2d 599, 600 (4th Dep't 1993)(citing Eddy v. Syracuse Univ., 78 A.D.2d 989, 433 N.Y.S. 2d 923 (4th Dep't 1980); Restatement (Second) of Torts § 328 (C) (1965). Similarly, causation must be determined by the finders. See Deridarian v Felix Contracting Corp., 51 N.Y.2d 308, 315,

670 N.Y.S. 2d 166, 169(1980)("Given the unique nature of the inquiry in each case, it is

for the finder of fact to determine the legal cause, once the court has been satisfied that a

prima facie case has been established.") Intervening intentional acts will not sever the

causal chain when the intervening tortuous conduct is foreseeable. See Hamilton v.

Accu-Tek, 62 F. Supp. 2d 802, 833 (E.D.N.Y. 1999) rev'd on other grounds 264 F. 3d 21

(2d Cir. 2001) (citing Gordon v. Eastern Ry. Supply, Inc., 82 N.Y. 2d 555, 562, 606

N.Y.S. 2d 127, 131 (1993): "An intervening act breaks the chain of causation only 'if it is

of such an extraordinary nature or so attenuated from the defendants' conduct that

responsibility for the injury should not reasonably be attributed to them.'"). The

intentional criminal use of a gun is closely connected with the defendants' conduct and

the foreseeable harm their business and the federal regulations are designed to prevent

against. See Kush v. City of Buffalo, 59 N.Y.2d 26, 33, 462 N.Y.S.2d 831, 835 (1983);

Nallan v. Helmsley-Spear, Inc. 50 N.Y.2d 507, 520, 429 N.Y.S.2d 606, 614 (1980); See

also NAACP, 271 F. Supp. 2d at 496-7. ("where the welfare and safety of an entire

community is at stake, the cause need not be so proximate as in individual negligence

cases.")

a) Application of Law to Facts

Evidence adduced during discovery demonstrates that defendant Atlantic had a

duty not to sell the subject firearm to Bernard Gardier, a prohibited purchaser, under the

circumstances of March 19, 1999. The breach of the duty of care was at least negligent

and, given defendant's refusal to implement different practices in the face of continuous

notification that it is selling crime guns, intentionally tortuous as well. Defendant

AcuSport had a duty to control the crime gun sales to its downstream distribution partners

where it had—or could have had—continuous notice of their dangerous sales, a duty
which it willfully breached, thereby contributing to the proliferation of crime guns in
New York, including the subject firearm which was foreseeably used to kill Anita Smith.
The evidence demonstrates that AcuSport had ample notice and reason to cut Atlantic off.
Had defendant done so, the subject firearm would not have been sold to Bernard Gardier.

      3.      Joan Truman Smith suffered special injury

Physical injury and death are special harms, different-in-kind from those suffered
by members of the community, entitling plaintiff to prevail in this action. See NAACP,
271 F. Supp. 2d at 498-99; Ileto v. Glock, 349 F. 3d 1191, 1211 (9th Cir. 2003); see also,
Burns Jackson Miller Summit & Spitzer v. Linder, 59 N.Y.2d 314, 333, 464 N.Y.S. 2d
712 (1983); Leo v. General Electric Co., 145 A.D. 2d 291, 538 N.Y.S. 2d 844 (3rd Dep't
19  ); Wakeman v. Wilber,147 N.Y. 657, 663 (1895); Callanan v. Gilman, 107 N.Y. 360,
370 (1887); Restatement (Second) of Torts § 821C cmt

      a)  Application of Law to the Facts

There is no dispute that Anita Smith was killed with a gun that was wrongfully
sold by Atlantic and AcuSport, which continued to do business with Atlantic long after it
had notice—or could have had notice—that Atlantic was one of a 'core group of corrupt
dealers' responsible for a disproportionate number of crime guns. Counsel for Atlantic
argues that Anita Smith's death does not set her apart from everyone else in New York,
citing this Court's opinion in Johnson v. Beemiller. (Atlantic Memorandum of Law at 13)
Without attempting to parse out counsel's erroneous reliance on Johnson v. Beemiller (a
case involving an unidentified gun),  it is clear that the relevant cases hold that physical

injuries suffice to demonstrate special harm, including this Court in the companion

action. Johnson v. Bryco Arms, 304 F. Supp. 2d at 392.


II.     Negligence

Plaintiff's have pled and proved a cause of action in negligence against

defendants, having presented evidence that each defendant had a duty to plaintiff,  each

breached that duty and such breach was the proximate cause of plaintiff's injuries.

1.     Duty

Defendants' duty to use reasonable care in the marketing and distribution of their

uniquely lethal products is firmly grounded in New York's common law of negligence.

As the Court of Appeals has explained, the recognition of a duty of care in New York is

not a mechanical analysis, but rather an apportionment of risk based on the particular

facts, circumstances and policies at issue. Palka v. Servicemaster Mgt. Servs. Corp., 83

N.Y. 2d 579, 584, 611 N.Y.S. 2d 817, 820 (1994).

> Common-law experience teaches that duty is not something derived or discerned
> from an algebraic formula.  Rather it coalesces from vectored forces including
> logic, science, weighty competing socio-economic policies and sometimes
> contractual assumptions of responsibility.  These sources contribute to the
> pinpointing and apportioning of societal risks and to an allocation of burdens of
> loss and reparation on a fair and prudent basis.

Id.

The Court of Appeals has recognized a duty to use care where the defendant has

the ability to reduce the risk of harm to the plaintiff. Thus in Nallan v. Helmsley Spear,

Inc., the landlord had a duty to the plaintiff, a visitor, because the landlord could have

taken protective measures to minimize the foreseeable danger to the plaintiff. 50 N.Y. 2d

24

507, 519, 429 N.Y.S.2d 606 (1960). Similarly, in <u>Stevens v. Kirby</u>, a tavern owner had a duty to a patron to maintain safe conditions on the premises or to take reasonable steps to prevent or minimize harm because the tavern owner sold alcoholic beverages to intoxicated persons and allowed fights and disorderly conditions to exist. 86 A.D. 2d 391, 450 N.Y.S.2d 607 (4th Dep't 1982). More recently, the Court of Appeals recognized in <u>Palka v. Servicemaster Management Service, Inc.</u>, 83 N.Y.2d at 589, 634 N.Y.S.2d at 823, that a hospital's maintenance contractor owed a duty of reasonable care to a hospital employee injured by a piece of equipment because the contractor was in a position to reduce the likelihood of injury by inspecting and repairing the equipment. <u>See also</u> <u>Liriano v. Hobart Corp.</u>, 92 N.Y.2d 232, 238, 677 N.Y.S. 2d 764 (1998)(manufacturer may be liable for product after it leaves its custody because of manufacturer's "superior position" to exercise control over the product). <u>Dukes v. Bethlehem Cent. School Dist.</u>, 216 A.D.2d 838, 629 N.Y.S. 2d 97 (3rd Dep't 1995)(determination as to whether defendant owed duty of care depends on determination that defendant had sufficient control over event to be in position to prevent negligence.)

In the context of firearms, the courts of this State have found a duty to use reasonable care on the part of a party supplying a gun. <u>See</u> <u>Splawnik v. DiCaprio</u>, 146 A.D. 2d 333, 540 N.Y.S.2d 615 617 (3rd Dep't 1989)(shooter's act of firing gun did not cut off supplier's liability for providing gun despite foreseeability of injury); <u>Zellers v. Devaney</u>, 155 Misc. 2d 534, 589 N.Y.S.2d 134 (Sup. Ct. Orange Co. 1992)(supplier of BB gun maybe liable for injury where suppliers "knew or in the exercise of reasonable care should have known that the particular chattel in the hands of the person to whom it was given represented an unreasonable risk of harm). In <u>Earsing v. Nelson</u>, 212 A.D. 2d

25

66, 629 N.Y.S.2d 563, 565 (4th Dep't 1995), the court reaffirmed this principle finding a claim to have been stated against the conveyor of a BB gun to a young person.

In a finding applicable to AcuSport here, in Hamilton v. Beretta, the New York Court of Appeals specifically found that "the negligent entrustment doctrine might well support the extension of a duty to manufacturers to avoid selling to certain distributors in circumstances where the manufacturer knows or has reason to know those distributors are engaging in substantial sales of guns into the gun-trafficking market on a consistent basis." 96 N.Y.2d 222, 237, 727 N.Y.S. 2d 7, 16 (2001). In a footnote, the Court of Appeals looks forward to an alteration of the duty equation, that is, to finding a duty on the part of manufacturers and distributors, where the evidence shows a "core group of corrupt FFLs". Id, note 5. This case presents the evidence envisioned by the Court: a dealer with a long history of corrupt dealing that is being substantially and consistently supplied with guns by its distributor.

2. Breach, Causation and Damages:

Once a court finds duty, the issues of breach and causation are left for the jury, even in instances where there was intervention by a criminal actor. See Nallan, 50 N.Y. 2d at 520-1, 429 N.Y.S.2d at 614 ("Of course, the fact that the 'instrumentality' which produced the injury was the criminal conduct of a third person would not preclude a finding of 'proximate cause' if the intervening agency itself was a foreseeable hazard."); Derdiarian v. Felix Contracting Corp., 51 N.Y.2d 308, 434 N.Y.S.2d 166 (1980). The intentional act of John Taylor, using the gun he could not have obtained legally, is the very harm defendants should have foreseen and taken steps to guard against. Indeed, it is the very harm the federal and state firearm laws are designed to guard against. See Kush

26

v. City of Buffalo, 59 N.Y. 2d 26, 33, 462 N.Y.S. 2d 831, 834 (1983)("When the intervening intentional act of another is itself the foreseeable harm that shares the duty imposed, the defendant who fails to guard against such conduct will not be relieved of liability when that occurs.")

a) Application of Law to Facts

Defendants are responsible for sending the .380 pistol and many other guns into the illegal market, where it was picked up by the shooters John Taylor and Craig Godineaux. The presence of the subject gun, as well as other crime guns traced to defendants is evidence of a substantial and unreasonable interference with public safety in New York. As Ms. Allen has indicated, these recovered guns represent a small fraction of the total number of demonstrably mobile crime guns plaguing this City and State.

Defendants each violated a discrete duty to the public and to Anita Smith by their negligent and intentionally wrongful conduct: 1) Atlantic breached a well-recognized duty to sell guns carefully so that the gun sold did not come into the hands of a prohibited person, and 2) AcuSport breached a duty not to entrust dangerous instrumentalities to entities known to sell them into crime, in substantial numbers of a period of time. See Hamilton v. Beretta, 96 N.Y. 2d at 237.

The evidence adduced from defendants and non-party witnesses shows that William Borsellino, for Atlantic, knowingly, recklessly and intentionally sold the Bryco .380 pistol to Bernard Gardier, a prohibited person, while falsifying federal records by having Angela Freeman, a non-prohibited person, complete the paperwork. This sale was in violation of the standards set forth by ATF and the National Shooting Sports Foundation, as well as defendant's own definition of a straw sale. The likelihood that a

wrongfully sold gun would do serious harm to a person, by way of injury or death, is extremely high. Professor Fagan and Ms. Allen's work document this phenomenom. The law does not require plaintiff to demonstrate that defendant should have known that the subject gun would be used to harm Anita Smith. It is enough that plaintiff's evidence demonstrates that defendants—Atlantic and AcuSport—knew and should have known the dangers of wrongful gun sales and failed to conform their behavior to the known risks.

## CONCLUSION

Based on the foregoing, the exhibits annexed hereto, and the record as a whole in this case, it is respectfully requested that defendants' motions be denied in their entirety and the case commended to a full trial on the merits before the triers of fact, and for such other and further relief as this Court may deem just and proper.

Dated: New York, New York
       June 24, 2005

Respectfully submitted,

LAW OFFICE OF ELISA BARNES

By: Elisa Barnes (EB4811)
Attorney for Plaintiff Joan Truman Smith
Office and P.O. Address
111 Broadway, 4th Floor
New York, New York 10006
(212) 693-2330